## SMITH *v.* CITY OF FOND DU LAC.

### HIGGINS *v.* SAME.

*(Circuit Court, E. D. Wisconsin. July 12, 1881.)*

MUNICIPAL BONDS—RAILROADS—CONSTITUTION OF WISCONSIN, ART. 11, § 3.

The legislature of Wisconsin passed an act whereby it authorized the defendant to subscribe to the capital stock of a particular railroad, and to make, issue and deliver to such company its bonds, etc., provided a majority of the legal voters of the defendant municipality shall first have voted in favor of such subscription, as also in favor of a proposition, in writing, stating the amount, kind, and description of stock or bonds, etc., to be subscribed, submitted by such railroad. The statute set no limit to the amount of such subscription, except that the city authorities could make only such subscription and issue such amount of bonds as called for by this proposition. In an action brought by holders of coupons attached to these bonds, *held,* such statute is not in conflict with section 3 of article 11 of the constitution of Wisconsin, providing for a restriction upon the power of municipalities, among other things, to borrow money, contract debts, and loan their credit.

2. FEDERAL COURTS—UNCONSTITUTIONAL STATE LAWS.

A federal court, when determining the rights of parties under a state law, will never, in a doubtful case, adjudge such law to be in conflict with the constitution of the state, unless sustained in so doing by some distinct adjudication of the highest court of the state.

*Foster* v. *City of Kenosha*, 12 Wis. 618, and *Fisk* v. *City of Kenosha*, 26 Wis. 23, *examined and distinguished.*

These are actions by the holders of coupons attached to certain bonds issued by the city of Fond du Lac in payment of a subscription made in its behalf to the capital stock of a railroad company originally known as the Milwaukee & Northwestern Railway Company, but whose name was subsequently changed to that of the Northwestern Union Railway Company. Each bond, dated November 7. 1871, is made payable to the Northwestern Union Railway Company, or bearer, and recites that it—

" Is one of a series of 750 bonds, bearing even date herewith, each for the sum of $100, * * * and is issued in pursuance of an election held in said city on the seventh day of November, 1871, under and by virtue of a certain act of the legislature of the state of Wisconsin, approved March 21, 1871, entitled 'An act to authorize certain towns, cities, and villages therein named to aid the Milwaukee & Northwestern Railway Company,' by which said act certain towns, cities, and villages were enabled to subscribe for and take stock of the said Milwaukee & Northwestern Railway Company, at which election a majority of the legal voters of said city voted 'for the railway proposition,' requiring the said city to subscribe for and take the common stock of the said Milwaukee & Northwestern Railway Company, in the sum of $75,000, and to issue the bonds of the said city therefor ; and the said election having been duly

ordered, noticed, and held by the proper authorities, and then and there declared duly carried 'for the railway proposition,' by said proper authorities, a proposition in writing having been previously made and submitted by said company to the proper authorities of the city of Fond du Lac, as required by said act after such an election, the same having been ordered and held, and notice of the time and place of holding the same having been given in all respects as required by law and the act aforesaid, the name of the said Milwaukee & Northwestern Railway Company was changed to that of the Northwestern Union Railway Company, by unanimous vote of the stockholders at a regular meeting thereof, held at the city of Fond du Lac on the third day of May, A. D. 1872, in pursuance of the statute in such a case made and provided."

The bonds were signed by the mayor and clerk, and attested by the corporate seal of the city. The bonds were executed by the city about July 13, 1872, and delivered to a trustee, who delivered them to the Northwestern Union Ralway Company in 1873, the city receiving stock in exchange therefor. They were sold in open market, the plaintiff subsequently becoming purchaser of those in suit, in good faith and for value. The city, by order of its council, regularly paid the interest coupons until November, 1880, when it refused to make further payment. Smith sued on $50,000, and Higgins on $25,000 of the issue.

*Edwin H. Abbot,* for plaintiff Preserved Smith.

*Winfield Smith,* for plaintiff Higgins.

*Edward S. Bragg* and *W. D. Conklin,* for defendant, city of Fond du Lac.

After stating the facts, Mr. Justice Harlan delivered, orally, his opinion upon the legal questions raised and discussed, as follows:

HARLAN, Justice. The recitals in the bonds import a compliance with the provisions of the statute under the authority of which they were issued. The fact that no such corporation as the Northwestern Union Ry. Co. was in existence at the date of the bonds is wholly immaterial, since it satisfactorily appears that they were, in fact, issued after that corporation was created, and by virtue of the statute of 1871, authorizing the city of Fond du Lac, and other designated municipal corporations, to subscribe stock in the Milwaukee & Northwestern Railway Company, and to execute bonds in payment thereof. The city is estopped, by the recitals in the bonds, to say that the change, by the original company, of its corporate name to that of the Northwestern Union Railway Company, was not in pursuance of the statute governing such cases.

Plainly, therefore, the only question among those discussed by learned counsel for the city which need be considered, is whether the

act of March 24, 1871, is in conflict with the constitution of Wisconsin. If that position be sustained, the bonds must be declared void, by whomsoever held, and without reference to the good or bad faith of those who now own them. With the decisions of the supreme court of the United States upon this point, counsel, I observe, are entirely familiar; and it is therefore unnecessary to make special reference to them.

The first section of the act of 1871 declares that it shall be lawful for the city of Fond du Lac, and certain named towns and villages, to subscribe to the capital stock of the Milwaukee and Northwestern Railway Company, and, in payment thereof,—

" To make, issue, and deliver to said company its bonds, payable to such person or persons, trustees or corporation, or to said company or bearer, at such time, for such sum or sums, with such rate of interest, not exceeding 10 per cent., transferable by general or special indorsement or by delivery, and in such form and manner, and upon such terms and conditions, as may be agreed upon by and between the directors of said railroad company and the proper officers of such town, incorporated city, or village, as the case may be; * * * but no such subscription for the stock or bonds of said company, and no such bonds or orders, shall be issued or delivered to said company, or money paid thereto, by or for any such town, city, or village, unless a majority of the legal voters of such town, city, or village, as the case may be, voting on the question, shall *first* have voted in favor of such subscription in the manner hereafter provided; but when such subscription shall have been made, the same shall be absolutely binding upon the town, city, or village by or in whose behalf such subscription shall be made."

The succeeding sections of the act made provision for a written proposition from the railroad company to the town, city, or village from which it desired a subscription. That proposition, the statute required, should state the amount, kind, and description of stock or bonds desired to be subscribed, the terms of the proposed subscription, and the mode in which its payment was desired to be made; and, if in bonds, then the company's proposition should state the amount of each bond, the aggregate of all such bonds, the rate of interest they were to bear, not exceeding 10 per cent., and the date of maturity. The statute also provided that the substance of this written proposition should be submitted to the legal voters of the municipality at an election called by the proper local authorities, after notice of not less than 20 nor more than 30 days.

The statute, it will be also observed, imposes no limit upon the amount which might be subscribed by the designated municipalities, except that the proper officers making the subscription, and issuing

the bonds, were restricted to the amount named in the written proposition submitted by the company, and ratified by popular vote; that is, the city authorities were not given the power to make any subscription, except such as was called for in the proposition submitted to and approved by the people. The absence of any other restriction upon the legal voters, as to the amount to be subscribed, brings the statute, it is earnestly contended, in conflict with the third section of article 11 of the state constitution, as interpreted by the supreme court of Wisconsin. That section provides:

"It shall be the duty of the legislature, and they are hereby empowered, to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments and taxation, and in contracting debts by such municipal corporations."

In support of the proposition that the act of 1871 is repugnant to the constitutional provision, and therefore void, we are referred to *Foster* v. *City of Kenosha*, 12 Wis. 618, decided in the year 1860, and to *Fisk* v. *City of Kenosha*, 26 Wis. 23, decided in 1870. In the first of those cases, the question was as to the constitutionality of a certain portion of the charter under which the city of Kenosha had made a subscription to the stock of a railroad company. That charter (section 8) contained these somewhat unusual provisions:

"The city council shall have power to levy and collect special taxes for any purpose (aside from what may be specially provided for in the charter) which may be considered essential to promote or secure the common interest of the city, or may borrow money on the corporate credit of the city for such purposes, any sum of money for any term of time, at any rate of interest, not exceeding 10 per centum, and payable at any place that may be deemed expedient. Bonds or scrip may be issued therefor, under the seal of the corporation, and the resources and credit of the city are pledged for the repayment of the sums so borrowed, with the interest on the same. All such moneys shall be expended under the direction of the city council. But no such tax shall be levied, or money borrowed, except in accordance with the provisions of section 44 of the city charter; and in all cases when questions under this section are submitted to qualified voters, the amount and object of the proposed tax or loan shall be specifically stated to be voted upon."  * * * Pr. Laws Wis. 1853, p. 304.

The supreme court of Wisconsin, speaking by Mr. Justice Cole, construed this provision as conferring upon the city council of Kenosha an unlimited power to contract indebtedness, including even debts wholly foreign to the purposes for which the municipal corporations were, or perhaps could be, organized. Let us see what the court said. Its language is:

"The common council have authority to contract debts to any amount; impose taxes for any and all conceivable objects and purposes; embark the finances and credit of the city in any enterprise which, in the judgment of the common council, will contribute to the wealth, prosperity, or trade of the city, or promote the social and material condition of its citizens. There is no limitation, no restriction, imposed by the legislature upon the power of the corporation to run in debt or burden the people with taxes. If the common council deem it expedient, and a majority of the voters of the city will sanction the policy, the city, in its corporate capacity, may carry on works of internal improvement at home or abroad, so that those works are calculated to stimulate the trade and increase the business of the city. No matter how ruinous and oppressive these special taxes might be to the owners of real estate, or to the minority of the tax payers, yet we do not see why, under this section of the charter, the common council and a majority of the qualified voters might not compel the city to become a stockholder in a line of steamboats to run up and down the lakes for the transportation of freight and passengers; subscribe for stock in railroads; improve harbors; open roads and build bridges, within or without the city limits; erect and operate flouring mills; keep hotels; or, in short, embark in any mercantile, manufacturing, or commercial enterprise, which in the language of the charter, ' may be considered essential to promote or secure the common interest of the city,' and pledge the resources and credit of the city for the repayment of all sums borrowed for these purposes, and impose taxes to meet the same." "Now," said the court further, "the question arises, can the legislature confer upon a municipal corporation such unlimited power of taxation, such unrestrained ability to contract corporate indebtedness and mortgage the real estate of the city?"

Again, and after stating that the provision there under consideration conferred the power of taxation for other than municipal purposes, the court remarked:

"It is a power to impose special taxes to any amount, or for any purpose whatever, which may be considered essential to promote or secure the common interest of the city. I do not think the legislature could confer upon any municipal corporation such unlimited, such absolute power of taxation. More especially is the legislature restrained from conferring such power under a constitution which imposes upon it the duty, in organizing cities and villages, to restrict their power of taxation, borrowing money, and contracting debts. * * * Can it confer upon a municipal corporation the right to impose taxes to any amount, and for any purpose? We think not. And, therefore, when the legislature attempts to confer upon a municipal corporation an unrestricted power to levy taxes and raise money, aside from and above what may be necessary and proper to support the local government, and for legitimate municipal purposes, such unlimited grant of power must be held to be void. Otherwise, no force or effect is given to the provision of the constitution cited."

I have read somewhat fully from the opinion in *Foster* v. *City of Kenosha,* because upon that case counsel for the city mainly rely.

Now it is quite clear, to my mind, that the supreme court of Wisconsin have not gone so far as the learned counsel for the city contends that it has. The point there decided was that the legislature could not, constitutionally, confer upon a municipal corporation authority to contract debts, without limit as to amount, or without any other restriction as to purposes than the judgment of a common council, sustained by a majority of voters, that the common interest of the municipality will be thereby promoted and secured. The court held that "such unlimited power of taxation, such unrestrained ability to contract corporate indebtedness, embracing, as it did, purposes confessedly non-municipal, was inconsistent with the object and design of imposing upon the legislature the duty of restricting municipal powers "so as to prevent abuses in assessments and taxation, and in contracting debts."

That decision by no means justifies the conclusion that the legislature may not authorize a municipal subscription to the capital stock of one designated railroad company, without limit, in one sense, as to amount, but yet to be made only after and in accordance with a formal written proposition by the company, setting forth as well the amount desired to be subscribed as the terms of the subscriptions, and also after the approval of such proposition by a majority of legal votes cast at an election called and held to pass upon that specific proposition.

In the act of March 21, 1871, the purpose of the subscription therein authorized was distinctly stated, viz.: to aid in the construction of a railroad in which the city of Fond du Lac had a business or commercial interest; whereas, the charter of the city of Kenosha did not limit taxation and indebtedness to municipal purposes. This difference between the present case and that case is very material. Consequently I do not feel authorized, by anything involved or decided in *Foster* v. *Kenosha*, to hold that the legislature of Wisconsin, in passing the act of 1871, transcended the limits prescribed by the fundamental law of the state. Nor does the subsequent case of *Fisk* v. *City of Kenosha* condemn the act of 1871 as unconstitutional. That case involved a construction of the same section of the charter of Kenosha as the one referred to in *Foster* v. *Kenosha*, and the court does nothing more than affirm its previous ruling.

My attention has been called by counsel for the complainant to the recent case of *Bound* v. *Wis. Cent. R. Co.*, etc., 45 Wis. 560. That was also a case of subscription by a town to the capital stock of a railroad company. The act under which the subscription was made

seems to have been identical with the act of March 21, 1871, in the respects to which the comments of counsel for the city of Fond du Lac have alluded; that is, the act did not fix a limit upon the amount of subscription otherwise than (as in the act now before us) to authorize such subscription as the voters approved when passing upon a written proposition of the company containing a statement of the amount of money or bonds desired, and the terms, conditions, and considerations upon which the same would be required to be paid. The report of the case in 45 Wis. does not show that the constitutional question now before us was there raised or distinctly passed upon. But it is nevertheless a fact of some significance that the opinion in *Bound* v. *Wis. Cent. R. Co.* was written by the same justice who wrote the opinion in *Foster* v. *Kenosha.* If the statute cited in *Bound* v. *Wis. Cent. R. Co.* had been deemed by him or by the learned court of which he was a member to be obnoxious to the constitutional provision in question upon the grounds stated in the latter case, it is not probable that he or the court would have overlooked that point, whether raised by counsel or not, or would have withheld an expression of an opinion to that effect.

I do not, therefore, feel obliged, by anything in the decisions of the state court, to adjudge that the legislature, in the act of 1871, exercised powers forbidden by the constitution of Wisconsin. In considering this question I have not forgotten what was said by the supreme court of the United States, when required, in *Fletcher* v. *Peck*, 6 Cranch, 128, to determine whether the legislature of Georgia had, in a particular enactment, violated the constitution of that state. The court there said, speaking by Chief Justice Marshall, that—

"The question whether a law be void for its repugnancy to the constitution is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case."

The more-recent decisions of the same court justify me, I think, in saying that a federal court, when determining the rights of parties under a state law, will never, in a doubtful case, adjudge such law to be in conflict with the state constitution, unless sustained in so doing by some distinct adjudication of the highest court of the state.

In this spirit were the declarations of the supreme court of this state in *Att'y Gen.* v. *Eau Claire*, 37 Wis. 400, when it said:

"We owe great deference to the legislative authority. It is our duty to give effect to all its enactments, according to its intention, so far as we have constitutional right and power. And to that end it behooves us, as far as we are able, to place such construction on statutes as will reconcile them to the con-

stitution, and to give them effective operation under the constitution, according to the intention with which they are passed. It would be a palpable violation of judicial duty and propriety to seek in a statute a construction in conflict with the constitution, or with the object of its enactment; or to admit such a construction when the statute is fairly susceptible of another in accord with the constitution and the legislative intention."

Recurring again to the particular constitutional provision in question, it is clear that the framers of the Wisconsin constitution imposed upon the legislature the duty of restricting the powers of municipal organizations in the matters of taxation, assessment, borrowing money, contracting debts, and loaning their credit. The determination, however, of what were abuses, what restrictions were required in particular cases, and the exact mode in which those restrictions should be imposed, were (and perhaps wisely) left to legislative discretion. That discretion was left untrammelled by the constitution, except that the legislature was enjoined to restrict the powers of municipalities "so as to prevent abuses in assessments and taxation, and in contracting debts." Whether a particular restriction would prevent such abuses to the fullest extent demanded by considerations of public policy, or by the spirit of the constitution, might often become a very embarrassing question, especially to a judicial tribunal, except in extraordinary cases like that of *Foster* v. *Kenosha*, where, in the judgment of the state court, the disregard by the legislature of its constitutional duty was so palpable and flagrant as to leave the court no alternative but to say that in the particular statute there involved the constitution had been violated. No such state of case is here presented. If the legislature, upon looking over the whole ground, reached the conclusion that, so far as municipal subscriptions in aid of the construction of this particular road were concerned, it was a sufficient restriction to permit a popular vote only upon a written proposition by the company, stating the amount, terms, and conditions of the subscription desired by it, and to authorize the local authorities to make only such subscriptions as were thus previously submitted to and approved by the voters, I do not see upon what sound principle the judiciary could interfere, and declare that the legislative discretion had been abused. We must assume that the constitutional injunction to so restrict municipal powers as to prevent abuses in assessments, taxation, and contracting debts was in the mind of the legislature, and that, in its judgment, fairly exercised, the act of 1871 contained all the restrictions necessary in that case to prevent such abuses. The legislature may have been mis-

taken, and subsequent developments may have disclosed the want of wisdom in its action; but, in the long run, it is safer to leave the people at the polls to remedy hasty or vicious legislation, not plainly unconstitutional, than for the judiciary to interfere, and, in so doing, usurp power which properly belongs to another department of the government.

Upon the whole case, I am of opinion that the law is for the plaintiff, and a judgment in his behalf will be entered.

The district judge participated in the hearing of this case, and concurs in the views I have expressed. He has heretofore considered the same questions, and reached substantially the same conclusions, in the case of *Long v. New London*, 5 FED. REP. 559. In the views there expressed by him the circuit judge, it will be seen, concurred. As the questions have been argued before me with the expectation that they would be re-examined, I have deemed it proper to state fully the grounds upon which my conclusions rest.