## DEMPSEY v. MARYLAND TRANSP. CO.

## MILLER FERTILIZER CO. v. SAME.

(District Court, D. Maryland. December 22, 1920.)

1. **Towage** ⊕⟳11(10)—**Tug liable for loss of tow.**

Owner of a tug *held* liable for loss of a barge in tow, where the master left port with three barges when storm signals were displayed, and on encountering weather no worse than should have been anticipated abandoned the barges and failed to take any action to save them after the storm had abated.

2. **Shipping** ⊕⟳208—**Tug owner not entitled to limitation of liability for lost tow.**

The owner of a tug, which failed to send assistance to barges for two days after being notified that the tug had cast them loose in Chesapeake Bay during a storm, *held* not entitled to limitation of liability for one which had sunk in the meantime.

In Admiralty. Suit by John J. Dempsey, trading as Dempsey & Sons, and by the Miller Fertilizer Company, against the Maryland Transportation Company. Decree for libelants.

Lord & Whip, of Baltimore, Md., for libelants.
Whitelock, Deming & Kemp, of Baltimore, Md., for respondent.

ROSE, District Judge. The libelants in these consolidated cases seek compensation for the barge Curtin, and for its cargo of fertilizer lost when, on the 7th of last March, it foundered in the Chesapeake, in consequence, as is alleged, of the default of the respondent's tug Seminole. The respondent denies liability, and in the alternative seeks to limit it to the value of the tug.

[1] On the first issue, the libelants must prevail. It is probable that the Seminole would have had difficulty in taking care of a tow of three laden barges in anything like stormy weather. Nevertheless, its master started from Baltimore, in early March, when storm signals were flying, and the barometer falling. In the bay, between the Patapsco and the Severn, he was caught in a heavy blow, which, however, does not appear to have been any worse than might at that season of the year have been anticipated from the weather indications accessible to him when he left port. His story of his difficulties, and of the way he dealt with them, as told by himself and other witnesses, does not inspire confidence in either his skill or his courage. When the gale became heavy, he cut off the barges he had in tow. He says, before doing so, he whistled them to anchor, although it does not appear that they heard his signal. He at once sought refuge for himself and his tug in Annapolis Harbor. It is quite possible that, by the time he cast off his charges, there was little else left for him to do; but there is much reason to suspect that it was poor seamanship which had gotten his tug in such a position that it was shipping a dangerous amount of water. Although the bad weather appears to have been of very short duration, he remained in the Annapolis harbor for nearly 24 hours, or until 4 o'clock the next afternoon, when he at last returned to look

after the helpless barges. He found one of them securely anchored and in good condition. Its master, however, told him that he had better look after the other two. He went towards the Curtin, the nearer of them; but he says he went aground before he got to it, and concluded that it was impossible to reach it. The charts do not show any shoal water in his way. When the Curtin was subsequently raised, there was no difficulty whatever in getting to her, and two days later a tug of at least equal draft with that of the Seminole went to the third barge, which lay from a quarter to a half mile nearer the shore than the Curtin, without trouble or apprehension of it.

The master of the barge to whom he first spoke testifies that, as the Seminole passed upon its return from the direction of the Curtin, its captain told him that both the other barges had sunk, and that nobody was aboard either of them. Neither of these statements was the fact. The truth was, in all probability, that he never went near enough either of the barges to form any accurate opinion as to what their condition was. He went back to Annapolis, and from there telephoned to the tug's owner in Baltimore that the barges were out in the bay, and that he had not coal enough left to complete the voyage to Norfolk. He was ordered to come back to Baltimore, and was told that another tug would be sent for his charges. On the next Sunday, apparently in every respect a pleasant day, he took his boat to Baltimore. At 4 o'clock in the afternoon, the Curtin, whose weight had been greatly increased by the ice which formed upon it, and whose pumps were frozen, went down, and its cargo became a total loss. On the next day, Monday, the respondent sent another tug to look after the barges, and the two which were still afloat were taken in charge without difficulty.

[2] What has been said renders unnecessary any further discussion of liability. May the respondent limit it?

The owner of the barge claims that he contracted for the services of the tug Baltimore, a larger and more powerful boat than the Seminole, and that, when the latter was sent, the master of the sunken barge did not accept its service until he was assured that it was strong enough for the work. If there was any breach of duty in this respect, it was that of the respondent. In fair weather, the Seminole was doubtless equal to the task of towing three such barges to Norfolk. It was a mistake for it to try to do so under the weather conditions to be expected when the trip began; but that appears to have been the blunder of the master rather than of the owner. Under stress, the former proved incompetent; but there is no reason to believe that before the event the owner had any reason to suspect that he was. The owner seems to have exercised reasonable care in selecting him.

But, if, on this point, the owner is entitled to a verdict of not guilty, or at least, not proven, how is it with its failure to see that the barges were looked after on Sunday?

The owner, that is to say, its president and its executive officer, whose privity and knowledge is for the purpose at hand that of the owner, was told by the captain of the Seminole on Saturday, by telephone from Annapolis, that he was not sure that one of the barges was all right. Nevertheless, as that captain reported that he was short

of coal to make the trip to Norfolk, the owner ordered him back to Baltimore, adding that another tug would be sent for the tow, as soon as the weather was fit. All the evidence is clear that the weather on Sunday, at least, was all that could be desired, and yet no tug was sent until Monday. No explanation is given for the delay. Under such circumstances, and in March, no one had the right to trifle with time. Had a tug gone down Sunday morning, the Curtin and it valuable cargo would doubtless have been saved. The failure to send one was, of course, with the privity and knowledge of the owner, for it was the owner who failed.

The petition for limitation of liability must be denied.