## THE SNUG HARBOR.
### No. 12108.

District Court, E. D. New York.

Aug. 25, 1931.

See, also, 29 F.(2d) 588; 40 F.(2d) 27; 46 F.(2d) 143.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (Charles E. Wythe, Sp. Asst. to U. S. Atty., of New York City, and Frederick R. Conway, of Washington, D. C., of counsel), for the United States.

Baird, White & Lanning, of Norfolk, Va., and Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Charles R. Hickox and Clement C. Rinehart, both of New York City, and Edward R. Baird, Jr., and George M. Lanning, both of Norfolk, Va., of counsel), for claimants.

CAMPBELL, District Judge.

This is a petition filed on behalf of the United States of America, as owner of the steamship Snug Harbor, to limit its liability for the loss of the barges Winstead and Vermillion, and their cargoes.

The facts are as follows:

The steamship Snug Harbor, owned and used by the United States solely as a merchant vessel, while on a voyage from Baltimore, Md., to Portland, Me., came into col-

lision on August 15, 1920, at 9:30 o'clock p. m., with the barge Pottsville in tow of the Covington, and sank at a point about four and a half miles east by north of Montauk Point Light, and became a total loss.

At 5:30 o'clock p. m., on the 14th day of September following, the barges Vermillion and Winstead, loaded with coal and in tow of the tug Barrelton, on a voyage from Norfolk, Va., to Fall River, Mass., without fault of those in charge of the tug or tow, came into contact with the wreck of the steamship Snug Harbor, and as a result were sunk, and with their cargoes became a total loss.

The United States of America, its agents, servants and employees, did not mark by buoy or light the wreck.

There was no affirmative act of abandonment on the part of the United States of America.

The collision of the Snug Harbor with the barge Pottsville occurred in a fog.

The crew of the Snug Harbor was saved, and the master thereafter made his report, in which he stated that the collision occurred one-half mile west, three-quarters south, from Montauk Point gas buoy.

This point is in the ocean at the entrance to Block Island Sound. The point where the Vermillion and the Winstead came into contact with the wreck of the Snug Harbor was in Block Island Sound.

The Snug Harbor was an iron vessel fully loaded with coal, and the master erred in fixing the place of sinking, as he did, six miles from the place where it occurred. The Snug Harbor, in sinking, went over on her side, and left nothing above water to mark the spot. Neither her masts, her funnel, nor any part of her superstructure was visible above the surface.

The wreck of the Snug Harbor lay on the bottom of Block Island Sound, in approximately forty feet of water, about four miles to the eastward of Montauk Point Light, and nine miles westward from the southernmost part of Block Island.

Block Island Sound is a wide roadstead, navigable for nearly its entire distance from shore to shore, for vessels of the largest size, a frequented channelway for north and south bound coastwise vessels going to and returning from Rhode Island and Massachusetts ports, which steer a course to take them over or close to the point of the wreck.

From the time of the sinking of the Snug Harbor on August 15th to the time of the sinking of the Vermillion and the Winstead on September 14th, no effort was made by the United States of America either to mark or reclaim the wreck, other than by the lighthouse tender Tulip.

Upon receipt on August 24, 1920, by the Shipping Board from the operators of the ship, the Coastwise Transportation Company of Boston, of the report of the master of the Snug Harbor of her sinking, inquiry was made from time to time of lobster fishermen habitually using Block Island Sound in an effort to ascertain if any one had information of the location of the wreck.

On August 19th the Lighthouse Service of the Department of Commerce undertook the duty of searching for, finding, and marking the wreck, and inquired of the Shipping Board as to the location of the wreck.

No vessel was assigned exclusively to the duty of searching for the wreck and buoying it, if found, but on August 28th an order was issued to the lighthouse tender Tulip, directing her to search for the wreck while on a regular trip or other business, and buoy it, if found.

On September 1st and 2d the Tulip, while on a voyage between New England ports, cruised the waters in and around Montauk Point for seven hours, in an effort to find the wreck, and did not succeed. The officers charged with the duty of searching had nothing more than general information of the sinking to guide them in finding the obstruction.

They had not communicated with the officers of the Snug Harbor, or with the officers of the barge with which she collided, and there is no evidence to show that the latter had communicated with them.

No effective effort was made by the Lighthouse Service to obtain specific and definite information from any source. Two other vessels were in collision with the wreck, one on the 23d day of August, and another on the 25th day of August, and reports were made at least four days prior to the sinking of the Vermillion and Winstead to the local inspectors and to the Lighthouse Service of these collisions, but no report was made to the Shipping Board thereof. These reports showed as to the barge Stetson that the obstruction was encountered "off Montauk Point," and as to the barge Fall River that the obstruction was encountered six miles east one-fourth south from Montauk Point Lighthouse, and these reports were the only information which came to the petitioner's offi-

cers, agents, servants, or employees respecting the location or position of the wreck, other than that given in the report of Capt. Swenson, the master of the Snug Harbor at the time she sank.

After these reports were received, no effort was made to locate the obstruction reported, other than by the Tulip, until the Vermillion and Winstead struck the wreck.

The wreck of the Snug Harbor was at the time of the filing of the petition for limitation of liability herein lying at the place hereinbefore found, within this district and within the jurisdiction of this court.

The facts as found show that the Snug Harbor was sunk in Block Island Sound, and that the barges Vermillion and Winstead came into collision with the wreck of the Snug Harbor and sank with their cargoes.

On the 27th day of May, 1929, the District Court for the Eastern District of Virginia, after trial of the issues, made a final decree against the United States of America, in the consolidated case, on the libels filed by the owners of the barges Winstead and Vermillion, and the owners of their cargoes. From these decrees the United States of America appealed to the Circuit Court of Appeals for the Fourth Circuit, which affirmed the decrees. The Snug Harbor, 40 F.(2d) 27.

These decrees imposed liability because of petitioner's falure to perform a personal, nondelegatable duty, that of buoying the wreck as required by statute.

The instant petition, which was filed on October 29, 1930, seeks a limitation of liability, so established.

The claimants appeared specially, and filed exceptions to jurisdiction, which were overruled by this court (Judge Galston presiding) on December 23, 1930. 46 F.(2d) 143.

The claimants answered, and exceptions to articles 12 and 14 of the answer were filed by the petitioner, on the ground that the issues presented had already been determined by Judge Galston, and that his decision became the law of the case in this court. These exceptions were not brought on for hearing, but were left for disposition on the trial, which was held on June 3, 1931.

In the twelfth article of the answer it is alleged that the Virginia litigation established the personal fault of the petitioner in failing to mark the wreck, as required by the Wreck Statute (33 USCA § 409), and that liability arising from such fault does not come within the scope of the limitation of Liability Act.

In the fourteenth article it is alleged that the Virginia litigation established that the loss of claimants' barges and cargoes occurred with the privity and knowledge of the petitioner.

The complete record of the Virginia litigation was not before Judge Galston when he heard the exceptions of the claimants to jurisdiction, his decision was thereon, and not a decision on the exceptions to articles 12 and 14 of the answer.

All that was before him with reference to that litigation was an allegation that the petitioner had been sued in Virginia under the Suits in Admiralty Act (46 USCA §§ 741–752), and had been adjudged liable to pay certain libelants for damages for the loss of the barges Winstead and Vermillion, and their cargoes.

No facts and circumstances were alleged with respect to the Virginia proceedings to enable the court to determine what the nature of the liability was that had been adjudged against the petitioner in Virginia.

The full record of the Virginia litigation is now before this court, and a different situation is presented there than on the hearing of the exceptions, and I cannot hold that with reference to such exceptions this court, in passing on the exceptions to the answer, is bound by that decision. Post v. Pearson, 108 U. S. 418, 2 S. Ct. 799, 27 L. Ed. 774; Roberts & Co. v. Buckley, 145 N. Y. 215, 39 N. E. 966; The Tenbergen (D. C.) 48 F.(2d) 363.

As the exceptions in question go to the root of the case, they will be generally considered in this opinion on the whole evidence offered on the hearing of this petition.

In view of the decision on the exceptions to the jurisdiction, the question now before this court is narrowed down to the single issue, whether, upon the facts found, the neglect and failure of the petitioner to mark and buoy the wreck of the Snug Harbor, upon which liability was predicated, occurred without the privity or knowledge of the petitioner, within the meaning of the Limitation Statute?

The claimants contend that the court in the Virginia litigation decided that the petitioner was liable for failure to perform the nondelegatable duty of buoying the wreck, and that the effect of the decision is to impose personal liability, and this court cannot consider whether it is correct or incorrect.

With that contention, as a whole, I cannot agree, because I am unable to find that the question now litigated, the right of the owner of the Snug Harbor to limitation of liability, was before the courts in the Virginia litigation.

 The courts in the Virginia litigation have found, and I find, that the Wreck Statute applies to the open waters of Block Island Sound where the Snug Harbor sank, that there is no evidence of any formal abandonment by the petitioner of the wreck, and that the request by the petitioner to the Lighthouse Service, to mark the wreck, was not an abandonment thereof which released the petitioner from its obligation to find and mark the wreck.

The courts in the Virginia litigation found that the failure and neglect of the petitioner to mark and buoy the wreck imposed liability under the Wreck Statute.

 The Wreck Statute, Act of March 3, 1899, c. 425, § 15, 30 Stat. 1152, now title 33, section 409, U. S. Code (33 USCA § 409), in so far as it is necessary for consideration in this case, provides as follows:

"§ 409. *Obstruction of Navigable Waters by Vessels; Floating Timber; Marking and Removal of Sunken Vessels.*—It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; * * * And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidently or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as hereinafter provided for." Section 19 of the Act of March 3, 1899, supra, now title 33, section 414, U. S. Code (33 USCA § 414), in so far as it is necessary for consideration in the instant suit, provides as follows:

"§ 414. *Removal by Secretary of Sunken Water Craft Generally.* Whenever the navigation of any river, lake, harbor, sound, bay, canal, or other navigable waters of the United States shall be obstructed or endangered by any sunken vessel, boat, water craft, raft, or other similar obstruction, and such obstruction has existed for a longer period than thirty days, or whenever the abandonment of such obstruction can be legally established in a less space of time, the sunken vessel, boat, water craft, raft, or other obstruction shall be subject to be broken up, removed, sold, or otherwise disposed of by the Secretary of War at his discretion, without liability for any damage to the owners of the same. * * * "

The Wreck Statute, supra, is mandatory, and imposed a duty on the owner to mark and buoy the wreck, and, if the statute be construed most favorably to the petitioner, as in the Virginia litigation, as creating an obligation only when the owner has knowledge of the fact of the wreck, and that there is no liability if the wreck cannot be found by the exercise of due diligence, the petitioner cannot escape liability, as the owner knew the fact of the wreck, and the wreck could have been found by the exercise of due diligence; and on all the evidence, given both in the Virginia litigation and orally on the trial herein, it appears that there was an almost absolute lack of diligence.

The petitioner relied solely upon the report of the master, and did nothing effective but to attempt to delegate its duty to the Lighthouse Service.

The report of the master of the Snug Harbor showed the sinking, in a fog, of the vessel at a point near the entrance to a navigable and much-used channel, where many vessels were constantly passing and in great danger of being sunk, and the circumstances surrounding the sinking were sufficient in themselves to have put the Shipping Board upon notice that there was uncertainty as to the place of sinking.

In addition to which there was the inquiry, on August 19th, by the Lighthouse Service of the Shipping Board as to the location of the wreck. This showed that the Lighthouse Service did not consider the wreck at sea. There was also the fact, well known to seafaring people, that there had been two collisions with a wreck off Montauk Point, on August 23d and 25th, within ten days after the sinking of the Snug Harbor, and about three weeks before the sinking of the barges Vermillion and Winstead.

There was also the investigation by the local inspectors which is customary in such

cases, and an examination of the record of that investigation would have shown the uncertainty as to the place of the sinking of the Snug Harbor.

The petitioner through its Shipping Board could not relieve itself from liability simply by requesting the Lighthouse Service to find and buoy the wreck, as the finding of the wreck was not the duty of the Lighthouse Service.

The duty of the owner was personal and not delegatable. The Anna M. Fahy (C. C. A.) 153 F. 866; The Macy (C. C. A.) 170 F. 930; Red Star Towing & Transportation Co. v. Woodburn (C. C. A.) 18 F. (2d) 77; Sullivan v. P. Sanford Ross, Inc. (C. C. A.) 263 F. 348.

■ The Wreck Statute, supra, is not in conflict with section 4283 of the Revised Statutes, now title 46, section 183, U. S. Code (46 USCA § 183), but is in harmony with its provisions, for the duty imposed on the owner by the Wreck Statute is a personal one. Eastern S. S. Corp. v. Great Lakes Dredge & D. Co. (C. C. A.) 256 F. 497.

The Wreck Statute is a criminal statute (Eastern S. S. Corp. v. Great Lakes Dredge & D. Co., supra; Sullivan v. P. Sanford Ross, Inc., supra), and the Limitation Statute cannot have any effect in limiting its provisions.

The Limitation of Liability Statute does not permit an owner to limit his liability on personal contracts. Luckenbach v. McCahan Sugar Co., 248 U. S. 139, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522; Pendleton v. Benner Line, 246 U. S. 353, 38 S. Ct. 330, 62 L. Ed. 770; Capitol Transp. Co. v. Cambria Steel Co., 249 U. S. 334, 39 S. Ct. 292, 63 L. Ed. 631.

Petitioner's advocate argues at length that, because limitation of liability may be had in case of a fire, even where exemption of liability could not be had under the Fire Statute, and cites United States v. Butler (D. C.) 278 F. 677, limitation of liability may likewise be had in case of liability imposed by the Wreck Statute.

I am unable to agree with that contention, for the reason that the Fire Statute, section 4282 Revised Statutes, now title 46, section 182, U. S. Code (46 USCA § 182), was derived from the Act of March 3, 1851, ch. 43, § 1, 9 Stat. 635, and is not penal but remedial. Chamberlain v. Western Trans. Co., 44 N. Y. 305, 4 Am. Rep. 681.

It is logical to relieve the shipowner from liability for loss or damage by fire, unless such fire is caused by the design or neglect of the owner, and also to allow limitation of his liability when exemption from liability is not allowed because of the neglect of the owner, for the reason that the Fire Statute is a remedial statute not one which is penal, whereas the Wreck Statute is criminal in its nature, and limitation of liability should be refused where the Wreck Statute is violated or a premium would be placed on a violation of law.

Neglect alone predicated on the conduct of the owner does not preclude limitation of liability, but the violation of a statute criminal in its nature does preclude limitation of liability.

■ The Limitation of Liability Statute, section 4283 Revised Statutes, now title 46, § 183, U. S. Code (46 USCA § 183), provides as follows:

"§ 183. *Liability of Owner Not to Exceed Interest.* The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

The intent of Congress in passing this statute was to enable the vessel owner to limit his risk to his interest in the ship, in respect to all claims arising out of the conduct of the master and crew, and for acts done without his privity or knowledge, while leaving him liable for his own fault, neglect, and contracts. The 84–H (C. C. A.) 296 F. 427, certiorari denied 264 U. S. 596, 44 S. Ct. 454, 68 L. Ed. 867.

■ Privity or knowledge as used in section 4283, Revised Statutes, supra, imports actual knowledge of the things causing or contributing to the loss, or knowledge, or means of knowledge, of a condition of things likely to produce or contribute to the loss without adopting proper means to prevent it. Petition of Canadian Pac. Ry. Co. (D. C.) 278 F. 180.

Under this definition, the petitioner would not be entitled to limit its liability, even if limitation were possible, where the loss was occasioned by violation of the Wreck Statute, supra, for the reason that the petitioner knew of the sinking of the Snug Har-

412

bor, and was put on notice that the position of the wreck had not been properly given by the master, and, knowing the danger to shipping of a wreck in a frequented channelway, took no effective action to find, mark, and buoy the wreck, but allowed the wreck to remain a menace to navigation, in an undiscovered position, unmarked, not buoyed, and unlighted and likely to damage shipping, and failed to adopt proper means to prevent it. See The Drill Boat No. 4 (D. C.) 233 F. 589; Dempsey v. Maryland Transp. Co. (D. C.) 269 F. 665, affirmed (C. C. A.) 279 F. 94.

There is a further restriction on the right to limit which would require more careful consideration, if there was a right to limit, where the damage had resulted from a violation of the Wreck Statute, supra.

■ The damages in question were occasioned by a wreck which had been submerged for about thirty days after the sinking ending her voyage, and limitation of liability is limited to limitation for disasters occurring on a particular voyage [The Pelotas (D. C.) 21 F.(2d) 236]; and for such loss or damage as occurs on the last voyage preceding the filing of the petition, or on the voyage on which the vessel is lost [The Alpena (D. C.) 8 F. 280].

No case has been cited, and I have been unable to find any, in which limitation of liability has been allowed to an owner for loss occasioned by noncompliance with the Wreck Statute; but limitation of liability has been refused to an owner for loss occasioned by a noncompliance with that statute. Eastern S. S. Corp. v. Great Lakes Dredge & D. Co., supra.

I therefore conclude as a matter of law that the petitioner, with knowledge of the wreck of the steamship Snug Harbor, and chargeable with notice of the uncertainty of her location, took no effective steps to ascertain the position of the wreck and perform the mandatory duty imposed on it by the Wreck Statute, to mark, buoy, and light the wreck, but attempted to delegate to the Lighthouse Service the duty of the petitioner to mark, buoy, and light the wreck, which it could not delegate; and that, as a result of the failure of the petitioner to perform its said nondelegatable duty to mark, buoy, and light the wreck, the barges Vermillion and Winstead collided with it and were sunk with their cargoes, liability for which had been imposed in the Virginia litigation upon the petitioner, because of the failure of the petitioner, with notice, to obey the Wreck Stat-

ute, and mark, buoy, and light the wreck.

The petitioner is not entitled to limit its liability.

A decree may be entered in favor of the claimants against the petitioner, dismissing the petition, with costs.

Submit findings of fact and conclusions of law for the assistance of the court.

Settle decree on notice.