Theo. C. Robinson and Dan Houck, both of Cleveland, Ohio, and Roger W. Spencer, of Duluth, Minn., for appellant.

W. P. Crawford, R. A. Crawford, and Crawford & Crawford, all of Superior, Wis., for appellee.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

This action was one to recover damages to appellee's water main and submarine cable occasioned by the alleged negligence of appellant in navigating its steamer "Thomas Britt" in Superior Bay on May 13, 1934. Upon removal to the Federal District Court, the trial was had without a jury. The court made special findings of fact and conclusions of law and awarded judgment in appellee's favor. This appeal followed; and appellant assails the sufficiency of the findings to support the judgment.

## LAKEWOOD S. S. CO. v. SUPERIOR WATER, LIGHT & POWER CO.

### No. 6006.

Circuit Court of Appeals, Seventh Circuit.

Feb. 16, 1937.

EVANS, Circuit Judge.

The district court made the following findings:

"1. The Bay of Superior is * * * situated between the Wisconsin shore * * * and a point of land in * * * Minnesota known as Minnesota Point * * *; the distance across the Bay * * * is approximately 4,000 feet;

\* \* \* a navigable channel of the average width of 400 feet and a water depth of 27 feet, \* \* \* extends through the Bay near the Wisconsin shore; a number of industries are located \* \* \* on the Wisconsin side, including grain elevators 'M' \* \* \*; the elevators are so located on the Bay, and lake vessels of all sizes up to 600 feet in length very frequently dock in appropriate channels in the Bay provided for that purpose, so that cargoes of grain can be loaded and unloaded from \* \* \* said elevators; \* \* \*.

"2. The conditions above described existed on May 13, 1934 and for a great many years before that time; plaintiff \* \* \* provided the water supply for \* \* \* City of Superior \* \* \* deriving such supply from Lake Superior by means of a water main, or intake pipe, extending from Minnesota Point across the Bay of Superior to the Wisconsin shore where it maintained a pumping station, \* \* \* from which the water supply was distributed \* \* \* (to) the City of Superior.

"3. Plaintiff used in connection with its water system a submarine electric power cable which also extended from Minnesota Point to the \* \* \* pumping station on the Wisconsin side; plaintiff's water main \* \* \* was laid \* \* \* in a trench beneath the bottom of the Bay and below low water mark \* \* \*; the said intake pipe was laid and constructed in the year 1891 and prior to the Act of Congress of March 3, 1889 (1899) [30 Stat. 1121], which provided that under certain conditions a permit from the War Department was required for the placing of similar structures \* \* \*, and plaintiff's water main was maintained in the same position where it was originally located in 1891 until after May 13, 1934, \* \* \* the date \* \* \* of the accident which gave rise to this litigation; plaintiff's submarine power cable was constructed and laid in a trench beneath the bottom of the Bay \* \* \* in accordance with a permit from the War Department and was being so maintained at the time of the \* \* \* accident \* \* \*.

"4. Neither the water main nor the submarine cable \* \* \* were obstructions to navigation in the Channel.

"5. The Steamer Thomas Britt was a large (steel) freight steam vessel 409 feet in length \* \* \*; it was owned and operated by the defendant, Lakewood Steamship Company, \* \* \*; on May 13, 1934, around 2:00 o'clock in the afternoon, said steamer under the command \* \* \* of its master, George A. Montgomery, was being navigated under its own steam \* \* \* down the Channel \* \* \* toward Elevator 'M' for the purpose of taking on part of a carload of grain; the vessel was light, \* \* \*; it was drawing about 3 feet of water forward and about 13 feet aft; on its way toward the elevator and before arriving there, upon the orders of the master of the vessel, who was in the pilot house, the starboard forward anchor was let go and dragged from that point a considerable distance before it reached plaintiff's water main and submarine cable, breaking the cable which was an armored 3-inch cable, breaking and tearing away sections of the water main and continuing further on for a distance of 200 to 250 feet, where the anchor grabbed and caught the anchor chain of the Enterprise dredge which was \* \* \* dredging \* \* \*; the said anchor continued to drag and said ship to move forward, breaking and tearing away the anchor chain of said dredge; the weather during the afternoon of said day up to and including the time of said accident was clear and the sun was shining; there was a light breeze, but it was comparatively calm.

"6. A warning sign was maintained by the plaintiff on \* \* \* Barker Island, which land \* \* \* was a mere projection of the Wisconsin shore; that said sign was a board structure 40.6 feet wide \* \* \* by 10.8 feet high \* \* \*; the said sign faced towards the Channel and the intake pipe and cable; the board composing said sign was painted white and lettering thereon painted black; the letters were very large and conspicuous, reading 'Water Main and Cable Crossing—Do Not Drag Anchor.' The sign \* \* \* was so placed \* \* \* that (it was) \* \* \* in \* \* \* view of a vessel navigating the Channel, as the Steamer Britt was, for \* \* \* several miles before arriving at \* \* \* the sign, intake pipe and cable; \* \* \* (it) was so located \* \* \* as to constitute 'adequate notice and warning to vessels navigating the Channel of the existence and approximate location of plaintiff's water main and submarine cable; \* \* \* on Minnesota Point there was a wide opening through the trees and woods that were growing \* \* \* in a diagonal line with the sign; this opening through the woods indicated the place where the water main and cable were located on the

shore of the Minnesota side * * * as extending from the warning sign on the Wisconsin side.

"7. George A. Montgomery, master of the Steamer * * * had an experience of sailing * * * of about 45 seasons and held a master's license * * * for 33 years; he had sailed the Superior Bay as master * * * during practically every season of his 33 years as master; he was entirely familiar with the Superior Channel and with the plaintiff's warning sign as located * * * and he was familiar with the opening or clearing through the woods on the Minnesota side * * * as indicating that the plaintiff's pipe and submarine cable extended * * * through said opening, continuing from the Wisconsin shore * * * in the vicinity of the * * * warning sign.

"8. As the Thomas Britt approached the place where plaintiff's water main and cable were located, the master of the vessel was in the pilot house (in command of) the vessel * * *; the pilot house is well to the forward end of the ship.

"9. The master, * * * while said vessel was approaching the plaintiff's water main and cable, failed to exercise ordinary care in observing the location of plaintiff's water main and cable with respect to the position of said vessel as moving in the Channel, * * *.

"10. * * * There was ample space in the Channel after a ship had safely passed plaintiff's water main and cable to make such maneuvers of the vessel as were necessary to safely * * * dock the same at Elevator 'M', and that had the master of said vessel exercised ordinary care in the management thereof he would not have dropped said anchor until after the vessel had safely passed plaintiff's water main and cable, * * *.

"11. That there was no want of ordinary care on the part of the plaintiff with respect to the location, maintenance or the marking of the location of its water main and cable, or otherwise, which in any manner caused or contributed to the accident or damage."

█ In support of its position appellant argues: (a) Appellee's water main was constructed without permit from the Secretary of War and in violation of the Acts of Congress and the statutes of Wisconsin. (b) It was an obstruction to navigation because a vessel is entitled to navigate on all the water in Superior Bay. (c) The water main was an illegal obstruction to navigation and therefore constituted a public nuisance. Appellee carried the burden, which it did not meet, of proving a permit from the Secretary of War. (d) Appellee was negligent in marking only the "approximate location" of its obstruction, when its plain duty was to mark the precise location. It finally argues that the rights of navigation are paramount; that the navigator was not negligent in committing an error of judgment as to the precise location of an obstruction when relying upon the misinformation imparted by appellee's sign.

Two Federal statutes have been called to our attention, and appellant relies largely upon them.

Act of September 19, 1890, 26 United States Statutes At Large 454, section 7: "That it shall not be lawful to build any wharf, pier, dolphin, boom, dam, weir, breakwater, bulkhead, jetty, or structure of any kind outside established harbor-lines, or in any navigable waters of the United States where no harbor-lines are or may be established, without the permission of the Secretary of War, in any port, roadstead, haven, harbor, navigable river, or other waters of the United States, in such manner as shall obstruct or impair navigation, commerce, or anchorage of said waters, and it shall not be lawful hereafter to commence the construction of any bridge, bridge-draw, bridge piers and abutments, causeway or other works over or in any port, road, roadstead, haven, harbor, navigable river, or navigable waters of the United States, under any act of the legislative assembly of any State, until the location and plan of such bridge or other works have been submitted to and approved by the Secretary of War, or to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of the channel of said navigable water of the United States, unless approved and authorized by the Secretary of War: *Provided: * * *.*

"Sec. 10. That the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of any waters, in respect of which the United States has jurisdiction, is hereby prohibited."

Section 10 of Act of 1899 [30 Stat. 1151, 33 U.S.C.A. § 403]. *"Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in.* The creation of any obstruction not affirmatively authorized by Congress, to the navigable

capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same."

It also cites two sections of the Wisconsin statutes which deal with the subject of navigable streams and their obstruction. We are not impressed by the applicability of the Wisconsin statutes.

The court's findings 9 and 10 were intended to fully cover appellant's asserted negligence, but it is argued that they are erroneous because they ignore the superior right of navigation and the absolute rights of the navigators.

Appellant's argument fails to give full effect to the findings in the light of the exception found in section 7, above quoted. There is no bill of exceptions. There is no finding which covers the permission or absence of permission of the Secretary of War. The statute uses the word "permission." It does not specify or call for a written license. The water main in question was laid in a trench beneath the bottom of the bay and below the low water mark as established by the Government, in 1891, and has been thus maintained from that time to the day of the damage, May 13, 1934. The court also found that the cable which was damaged was laid in a trench in accordance with a permit from the War Department.

This case is before us as an appellate court without the evidence presented to the trial court. On the findings we must conclude that neither the water main nor the damaged cable constituted an obstruction to navigation, but each was laid and maintained in its present position with the consent and permission of the War Department.

This conclusion is predicated on the fact that:

(1) The water main has lain forty-three years in the identical position where it was originally placed, and there has been no governmental protest during all this time.

(2) A great sign, visible for miles, openly proclaims the existence and location of the main. There is no concealment of its location. In addition to the sign a marked clearance of the woods parallel with the main and cable denotes their presence.

(3) The statute in force at the time of the main's construction provided that "permission" of the United States Government should be obtained therefor, and not that a "documentary permit" was necessary.

(4) An electric cable was subsequently laid, pursuant to a permit, the application for which must have furnished additional notice to the Government of the existence of the main.

(5) The absence of a finding that the water main was unlawfully placed is significant, where we are unable to look to the evidence to ascertain whether there was or was not permission by the Secretary of War to lay the water pipes. We can hardly presume in the face of all the other findings that the water mains were illegally placed in the bottom of the harbor or that their known continuance there for forty-three years has been illegal.

There is confirmation of this conclusion to be found in a study of the two statutes, the Acts of 1890 and 1899. It is doubtful at best whether the first act applies to water mains such as the one under consideration. The Act, which we may well call the original Act, or the Act of 1890, dealt generally with wharves, piers, dams, breakwaters, etc. The Act of 1899 extended the objects called "obstructions" the construction of which without permission of the Secretary of War was prohibited.

If we were to assume that no permit was granted to lay the water pipes, but it affirmatively appears that permission to lay the cable was given, the District Court was justified from such facts in concluding that the Government was merely construing the Act. Its construction was that no permission was required under the Act of 1890 to lay the water main in question. Under the

Act of 1899 permission to lay the submarine cable was necessary.

In other words, we assume that in the absence of the statute of 1890, the laying of the water main would not have been unlawful. Unless this right was lost by the Act of 1890, appellee was acting strictly within its rights. In 1899 the Act was amended, but the amendment did not apply to appellee's water main which had been previously laid. It was apparently held, however, to be applicable to the submarine cable which was laid after the passage of the 1899 Act. Not only is there support for such constructions of the two acts, to be found in their language, but the action of the Government in respect thereto constituted a contemporaneous construction of them. On this theory, we must, as did the District Judge, conclude that even though no permit by the Secretary of War be shown, the appellee did not violate the Act of 1890 because such act did not apply to water mains placed at the bottom of the bay.

The judgment is
Affirmed.