Petition of **POTOMAC SAND AND GRAVEL COMPANY, as Owner of the BARGE 125 for Exoneration from or Limitation of Liability in a Cause of Cable Damage, Civil and Maritime.**

**No. 4667.**

United States District Court
D. Maryland.
April 15, 1966.

Carlyle Barton, Jr., Donald A. Krach, Niles, Barton, Gans & Markell, Baltimore, Md., for petitioner.

Thomas J. Kenney, U. S. Atty., Paul M. Rosenberg, Asst. U. S. Atty., Baltimore, Md., and Bertram E. Snyder, Atty., Admiralty and Shipping Section, Dept. of Justice, Washington, D. C., for claimant.

WINTER, District Judge.

This proceeding for exoneration, or limitation of liability, arises from the following:

The Mattawoman Creek, approximately 4,400 feet in width, is a navigable body of water within Charles County, Maryland, approximately thirty miles south of Washington, D. C., which flows in a southwesterly direction into the Potomac River. The place of its confluence with the Potomac River is known as Indian Head, Maryland, consisting of Cornwallis Neck on the northeast shore, and Stump Neck on the southwest shore. On both necks the United States Navy maintained a military installation, i. e., the United States Naval Propellant Plant. To provide electric power and communications to both necks, cables are submerged in the creek and run between the installations on both sides of the creek.

In 1963, a new electric power cable was installed across the creek to replace an outmoded existing cable. The new cable was installed pursuant to a Corps of Engineers' permit, issued September 3, 1964.

Petitioner, Potomac Sand and Gravel Company (hereafter called "Potomac"), owned various sand and gravel deposits situate in the upper reaches of Mattawoman Creek, above the town of Marbury, Maryland. To work these deposits, Potomac posted a dredge (Dredge No. 5) in the upper reaches of the creek and began dredging operations in early January, 1964. Potomac, because of shallowness in the upper reaches of the creek near Dredge No. 5, could not utilize its Tug Keystone to tow barges up and down Mattawoman Creek to and from the dredge. It, therefore, anchored Barge No. 125 in the creek somewhere upstream from the cable-crossing area and employed the Tug Keystone to tow empty barges from Potomac's Washington, D. C. plant and into the mouth of the creek to Barge No. 125, where the Tug Fairfax, of shallower draft than the Tug Keystone, would disengage the empty barges, take them to Dredge No. 5 and then return to the Keystone, or Barge No. 125, with loaded barges for the Keystone to take back to the Washington, D. C. plant.

On February 8, 1964, in the early morning hours, the Keystone towed a flotilla of five unladen barges from Potomac's plant in Washington, D. C., proceeded down the Potomac River, met the Tug Fairfax, and secured her alongside. The entire flotilla arrived at the juncture of the Potomac River and Mattawoman Creek at approximately 9:45 A.M. The Fairfax disengaged the empty barges and proceeded up the creek to Dredge No. 5 with the barges in tow. The Keystone tied up to Barge No. 125. Between 9:51 and 9:52 A.M. an interruption of power was experienced at the Indian Head facility, shown by stopped electric clocks to have occurred at that time. Investigation showed that the submarine power cable was torn loose from the Stump Neck side of the creek, so that its terminal end and pothead lay loosely out in the creek and away from its securing pole.

On April 29, 1964, Potomac, as owner of Barge No. 125, filed a petition to obtain exoneration or, alternatively, to limit its liability to the value of the barge (stipulated to be $10,000.00) for the claims exceeding $45,000.00 demand-

ed by the United States for damages to the submarine cable. An order was entered allowing Potomac to file a stipulation of $10,000.00 for the value of the barge and staying and restraining all other suits, actions or claims of any nature arising from the February 8 cable damage. The United States (hereafter called "Claimant") answered Potomac's petition, alleging expressly that the Keystone, valued at approximately $225,000.00, dragged Barge No. 125 over the cable area, thereby causing the damage. Claimant moved to amend the restraining order to allow it to proceed against the Tug Keystone in a separate action, or to require Potomac to include the value of the Tug Keystone in the limitation proceedings. After Potomac answered and excepted to Claimant's motion, the parties stipulated that ruling on the motion be deferred until the conclusion of the trial of the limitation proceedings and allowing the United States to recover damages to the value of the Tug Keystone, as if formally in the limitation proceeding, if the Court should find the Keystone at fault in causing damage to the submarine cable. Later, an order was entered setting the petition for hearing on the issue of liability only, and the matter has been submitted for decision on this question.

The proctors for the parties agree that the key question bearing on the issue of liability is how the submarine cable was damaged. This question is factual. By the very nature of the type of damage, and the circumstances under which it occurred, this question must be determined largely by circumstantial evidence. The proctors conceded, in a joint pretrial memorandum, that from the evidence the Court might conclude that the cable was damaged by the act of Barge No. 125 alone, by the act of the Tug Keystone alone, or by the joint act of the Tug Keystone and Barge No. 125. The proctors also conceded that in regard to any one of the three alternatives previously stated, the Court could find any one of three additional alternatives, viz., that there was mutual fault on the part of both parties, fault solely on the part of the petitioner, or fault solely on the part of claimant.

At trial and in final argument, petitioner contended that the cable was damaged by being caught in the pintle which is part of the kort nozzle of the Keystone, but that fault rested solely on claimant by reason of the negligent manner in which the submarine cable was installed, so as to constitute it a hazard to navigation. Explicit in the contention was the assertion that there was no negligence or want of care on the part of petitioner which caused or contributed to the damage. Claimant contended that the cable was damaged by being caught in one or more of the flukes of one or both of the anchors by which Barge No. 125 was moored, at a time when Barge No. 125 was pushed or pulled by the Tug Keystone, and that the damage was the sole fault of petitioner. Explicit in this contention was the assertion that the submarine cable was properly installed by claimant, and there was no negligence or want of care on the part of claimant causing or contributing to the damage. An analysis of the evidence, and the Court's findings therefrom, follow.

A—*How the Submarine Cable was Damaged:*

The damaged submarine cable was a 3-conductor, polyethelene-insulated, lead-sheathed, armored and jute covered, 15 KV cable, 2.83 inches in diameter, and weighing 10 pounds per foot. It was installed in the general area of previous submarine power and telephone cables which existed since at least 1955, some of which had been abandoned and some of which were still in use. The cable was not entrenched in installation except as it approached the shore line on either side of the creek, because Mattawoman Creek has a soft, muddy bottom and it was thought that by its own weight the cable would sink appreciably after being laid across the creek. Because there was a question of how deeply the cable would sink, it was laid in a

generously curving double arc (serpentine) to allow sufficient play for the cable to seek a lower level. There were 4,520 feet of cable actually laid; 4,447 feet would have been required to lay a cable in a straight line between the two points on shore where the cable came out of the water. There was, therefore, 73 feet of play in the cable and, if the cable rested on a flat bottom and did not sink, and if the cable were laid in a single arc, the point of maximum departure from a straight line, between the two points where the cable entered the water, would be at least 350 feet from that line.

On either side of the creek the area in which the cable had been laid (and existing cables previously laid) was marked by signs reading, "Cable Crossing—Do Not Anchor." The letters on the signs were 18 inches high, and the distance between the signs from shore to shore was in excess of 3/4ths of a mile. On the Stump Neck side the sign was 6 feet downstream from the point where the cable came ashore. On the Indian Head side the sign was approximately 150 feet upstream from the point where the cable entered the water. The course of the cable across the stream was not marked, but the evidence indicated that the course of the cable was a maximum of 150 feet upstream from the point that the two ends entered the water, so that the cable was in the general area defined by the crossing signs.

Mattawoman Creek has a chartered mean low water depth of 7½ feet in the cable-crossing area. The depth of water varies with the tides and weather conditions. A strong northeast wind can cause low tides to be 1½ to 2 feet below charted mean low water depth. The creek has no clearly defined channel. In January, 1965, when the Keystone towed Dredge No. 5 into position in the upper reaches of the creek to begin dredging operations, the Keystone plowed through the soft, muddy bottom of the creek, notwithstanding that there then existed a condition of extremely high tide.

The Tug Keystone is a 108-foot long, twin-screwed, 1,100 horsepower tug boat, with a draft, fore- and aft, of 6.5 feet. It was capable of producing 34,500 pounds of pushing force; its pushing power achieved this maximum by the use of kort nozzles, which are metal shrouds surrounding both screws, which increased the thrust of the screws and kept objects out of the propellers. There are two pintles, fore of the screws and part of each of the two kort nozzle assemblies. These pintles are the means of supporting the flanking rudders, and the maximum space between the flanking rudders and the pintles is 1½ inches. The pintles are not lower than the tug's keel. The distances between various combinations of the fore pintles are three-fold. The distance between the outboard pintles is 17 feet 2 inches, and between the inboard pintles 7 feet 10 inches. There are also two pintles in the portion of the kort nozzle assembly aft of the screws which support the steering rudders, but the parties concede the aft pintles can have no significance in this case.

The Tug Fairfax is a smaller, less powerful tug than the Keystone and has a lesser draft.

Barge No. 125 was anchored in Mattawoman Creek on February 5, 1964. Prior to anchorage, Potomac requested a mooring point in the deeper water of Mattawoman Creek adjacent to Cornwallis Neck. Naval officers stationed at this installation refused the request, apparently because of its proximity to the point where used propellant fuel was burned. Potomac then determined to moor Barge No. 125 approximately 500 yards east of the cable-crossing area near the Stump Neck side of the creek. The captain of the Keystone was given instructions to anchor the barge with two 200-pound anchors at a point east from the cable-crossing area in the deeper portions of the creek near the Stump Neck side of the creek.

How the orders were executed is a matter of dispute. The captain of the Keystone testified that the barge was

moored as directed, but the point selected was arrived at totally without any navigational aid, and the testimony of the captain of the Keystone, a crew member of the Keystone, and the captain of the Fairfax, both at trial and on deposition, placed the barge within a range of 150 feet to 1,500 feet above the cable area. Potomac's fleet superintendent claimed that, when he saw it on February 6, the barge was placed in accordance with the orders, but he could not remember the place from which he made his observation of the barge after mooring; he did not know where the cable was, and he could not see the cable signs when he observed the barge in the creek. This witness marked a chart to show when he saw the barge and he placed it 5,000 feet above the cable-crossing area. Potomac's assistant general manager, the only witness entitled to any credibility as to where the barge was anchored, testified that he last saw the barge on February 6 at approximately 1,500 feet from the cable-crossing area.

The barge was moored by the use of two old-fashioned or admiralty-type anchors, with fixed stocks secured to a single length of wire rope made fast to a chain which, in turn, was secured to a corner bit. The anchors had small flukes, and the presence of a stock would normally prevent more than one fluke from each anchor digging into the bottom of the creek. A mushroom anchor, which has no flukes, would not damage a cable if dragged over it, and a stockless anchor allows both flukes to dig in and provide holding power. Either of these types of anchors would have provided greater holding power for Barge No. 125. Even if admiralty-type anchors with fixed stocks were used, either a 2-point method or a 4-point method of anchorage would have provided better protection against dragging.

Irrespective of where Barge No. 125 may have been initially anchored, a preponderance of the evidence shows that, on the morning of February 8, 1964, it was not at all times 1,500 feet above the cable-crossing area.

Approximately 10 A.M.* a civilian member of the security forces at Indian Head, who was looking for the cause of the interruption of power, saw, from an observation platform and using landmarks, the barge directly in the cable-crossing area; and, about 10:20 A.M., an electrician employed at Indian Head also observed Barge No. 125 in the cable-crossing area. The latter, from his view on the Cornwallis Neck side, where the cable entered the water, could see the barge directly in line with the cable warning sign on the Stump Neck side. If petitioner's testimony as to the maximum distance at which the barge had been anchored above the cable-crossing area is accepted, the inference is inescapable that the barge dragged as a result of weather conditions, or as a result of power supplied by the Keystone, or both. That this inference should be drawn is further indicated by the fact that a Navy diver could find only one anchor for Barge No. 125 on February 9. He thought that the other anchor was beneath it. Petitioner's divers could also find only one of the two anchors when they dove on them after the accident. Even standing alone, this testimony would support the inference that the barge had dragged or been dragged, because, as originally placed, the testimony is undisputed that the anchors were 25 feet apart.

On the day of damage petitioner's testimony is that the flotilla of the Keystone, the Fairfax and the empty barges cut engines and drifted across the cable-crossing area. On that date there had been a northwest wind, as well as low tide, so that the water in the creek was

---

* 9:45 A.M. was the witness' estimate of the time he was advised of a power failure. The stopped electric clocks show that the power failure occurred 9:51-9:52 A.M. The witness, who was looking for the cause of power failure, must have received notice of the power failure after 9:45 A.M. and began his investigation after that.

quite low, although not as low as it had been observed by those familiar with the area on other occasions. After crossing the cable area the Fairfax proceeded with the empty barges upstream. What the Keystone did thereafter is a matter of dispute.

The personnel aboard the Keystone testified that she was moored to Barge No. 125, where she remained with her engines idling awaiting a rising tide. After 1:00 P.M. the tide changed sufficiently to permit the Keystone to proceed up the creek for the purpose of meeting the Fairfax with loaded barges on the Fairfax's trip downstream.

Two eyewitnesses, previously mentioned, the civilian security officer and an electrician who spotted Barge No. 125 directly in the cable-crossing area, observed differently. Their observations, made at approximately 10:00 A.M. and 10:20 A.M., respectively, were that the Keystone was straining and billowing black smoke, but not moving. The security officer when he observed the Keystone, saw it pushing Barge No. 125 toward the Potomac River. The electrician saw the cable which was entrenched in 2 feet of soil on the Cornwallis Creek side move as the tug accelerated. He saw that the Keystone was pulling Barge No. 125 and facing toward the Potomac River when he observed it.

On the afternoon of February 8 the position of Barge No. 125 was accurately surveyed and found to be approximately 1,350 feet above the cable signs where these two witnesses had first seen it. Since the barge is incapable of moving upon its own power, the conclusion is inescapable that the barge was moved from the time of the first observation at approximately 10:00 A.M. and 10:20 A.M., respectively, and the time that its position was actually surveyed in the afternoon.

After the incident of February 8, 1964, several significant facts were developed. First, it is undisputed that some eight days later Barge No. 125, moored as above described, dragged its moorings and went ashore as a result of weather conditions. Secondly, the Navy diver who dove on the barge's anchor immediately after the accident found a cable, thought to be a telephone cable, in the flukes of one of the anchors.

A third set of significant facts was developed as a result of recovery of the damaged power cable. When recovery of the cable was undertaken, it was found that the cable was buried no less than three, and as much as five, feet under the mud in the bottom of the creek. Snapped from the end of the pothead pole on the Stump Neck side of the creek, the configuration of the cable showed a sharp "V" approximately midstream which, when plotted on a chart on which is also plotted an observed position of Barge No. 125 on February 8, 1964, places the apex of the "V" well within the range of the anchors of Barge No. 125 in its observed position.

When recovered, the cable was found to be damaged for a length of approximately 80 feet. There were two noticeable kinks 18 feet apart. Depending upon which side of the cable is assumed to be "up," one excised kink completely matches the configuration of the side of one of the flukes of one of the anchors used to moor Barge No. 125.

 In a case of this type, where there must be heavy reliance on circumstantial evidence, the facts cannot be found with absolute certainty or beyond a reasonable doubt. The rights of the parties, however, may be determined by a preponderance of the evidence and, as an ultimate fact, the Court finds from a preponderance of the evidence that the Keystone pushed or pulled Barge No. 125 across the cable so that one or both of the flukes of one or both of the anchors of Barge No. 125 damaged the cable. This ultimate finding rests upon the following findings:

The Court finds that the damaged cable did not come in contact with the kort nozzle. The cable would not fit in the space between any of the forward pintles and the flanking rudders, and the

cable is not sufficiently malleable that it could be pinched into a space approximately 1 inch smaller than the size of the cable. If contact occurred between the damaged cable and the pintle, the cable would tend to slip off of the pintle in an undamaged state as readily as it had slipped onto it. The Court finds that the cable was sufficiently buried in mud so that it is unlikely that there was any contact between the cable and the kort nozzle unless the Keystone were operated in waters much shallower than her draft. That there were two kinks in the cable the same approximate distance apart as the distance between the Keystone's outboard kort nozzles is of little significance when it is remembered that the anchors of Barge No. 125 were 25 feet apart and secured such that they could come together and that the cable showed damage for a considerable length on either side of the kinks.

Where Barge No. 125 was originally anchored admits of speculation under the evidence in the case. She was not moored in a manner which would prevent dragging; but, assuming that she had been originally moored a safe distance upstream from the cable-crossing area, weather conditions for February 8 and the days immediately prior thereto were not such as to indicate that she dragged into the cable-crossing area in that the wind was generally from the northeast. The inference the Court draws from the evidence of a cable (presumably a telephone cable) intertwined in the flukes of one anchor and the matching configuration of the edge of the fluke and the excised portion of damaged cable is that the barge was present in the cable area and one or both of her anchors caught the cable. The Court finds corroboration of this inference by weighing the credibility of the two witnesses who placed Barge No. 125 in the cable-crossing area shortly after an interruption in power supply was experienced against the credibility of the personnel aboard the Keystone. Although one of the witnesses placing the barge in the area even observed a correlation in movement of the cable with acceleration of the engines of the Keystone, the Keystone personnel flatly denied that the Keystone moved after mooring to the barge or that the Keystone or the barge had contact with the cable. It is more likely than not that one or both of the anchors of Barge No. 125 was dragged into the cable-crossing area, and by Barge No. 125 being pushed or pulled, or both, by the Keystone, came in contact with the cable and damaged it.

### B—*Who Was At Fault:*

█ On the issue of fault, Potomac offered extensive evidence to show its unsuccessful protest to the issuance of the permit pursuant to which the damaged cable was laid, on the ground that a proposed installation on the bottom of the creek without entrenchment would constitute the cable a hazard to navigation. Potomac also offered evidence to show that the specifications of the contract under which an independent contractor was employed to install the cable were faulty, that the contractor was lacking in experience and incompetent, that the method of installation of the cable was faulty, and that there was negligence on the part of the claimant or its independent contractor in not causing the cable to be entrenched, in not causing the path of the cable to be marked, and in not "walking" the cable after installation to determine that it sunk to a proper depth and was not resting on or above the bottom of the creek because of the presence of rock, hard bottom, other cables, or other sunken object. All of this evidence, however, is largely irrelevant to the issue of fault, because the Court has found that the cable was damaged by one or both of the dragging anchors of Barge No. 125, while the barge was being pushed or pulled by the Keystone, and not because the cable came in contact with one or more of the Keystone's kort nozzles. From this finding, it necessarily follows that, even if the plan for installation of the cable were negligently prepared, or if the cable were

negligently installed, such negligence could not have been a proximate cause of the damage to the cable. Significant in this regard is the fact that, notwithstanding its claim that negligence in the installation and maintenance of the cable was the sole cause of damage to it, Potomac's floating equipment, including the Keystone, passed over the cable fifty-six times prior to February 8, 1964 without damage either to the electric power cable or any other preexisting cables.

■■ The preponderance of the evidence showed that Potomac knew where the cable crossing signs were located, what was the cable-crossing area, and that the cable was not entrenched. The preponderance of the evidence also showed that the cable generally was between the cable crossing signs and, hence, within the cable-crossing area. The law does not require the presence of a submarine cable to be marked with blueprint precision; it is enough that cable crossing signs warn of the approximate location of the cable. Gray v. Johansson, 287 F. 2d 852, 853 (5 Cir. 1961); Lakewood S. S. Co. v. Superior Water, Light & Power Co., 88 F.2d 895, 897–898 (7 Cir. 1937); Postal Telegraph Cable Co. v. P. Sanford Ross, 221 F. 105 (E.D.N.Y. 1915). When so marked, a submarine cable, constructed pursuant to a permit issued by the Corps of Engineers, is not per se an obstruction to navigation within the meaning of 33 U.S.C.A. § 403; nor is a cable laid on a river bottom with ample water above for vessels to pass over it in the ordinary way, an obstruction to navigation. The Elsie, 288 F. 575 (N.D.Cal.1923). See also, Canadian Pacific Ry. v. United States, 272 F.2d 913 (9 Cir. 1959). In the instant case, the cable was sufficiently marked and the damage did not result from navigation in the ordinary way.

■ From the evidence concerning the manner in which Barge No. 125 was moored, and the known composition of the bottom of Mattawoman Creek, the Court finds that a 1-point method of mooring, using two admiralty-type anchors with fixed stocks, was improper and was itself an act of negligence. While a 4-point method of anchorage would have been impractical for a barge intended to be used as a point of mooring for tugs and other barges, a 1-point method of anchorage using a mushroom anchor or a 2-point method of anchorage using a mushroom anchor or a stockless anchor or an admiralty-type anchor with fixed stock would have been a proper and reasonable method of anchorage. Whether as a result of improper mooring, Barge No. 125 drifted into the cable-crossing area or whether Barge No. 125 was initially anchored within or negligently close to the cable-crossing area so that improper mooring was a proximate cause of injury to the cable is not decided.

■ What is decided is that the Keystone, in attempting to correct the drift, or for some other undisclosed reason, pushed or pulled Barge No. 125, with its anchors dragging, into the cable-crossing area, so that one or both of the flukes of one or both of the anchors damaged the cable. This operation was negligence and was a sole proximate cause of the injury. For a like conclusion in substantially similar factual situations, see United States v. The John R. Williams, 144 F.2d 451 (2 Cir. 1944), cert. den. sub nom. Great Lakes Dredge & Dock Co. v. United States, 323 U.S. 782, 65 S.Ct. 271, 89 L.Ed. 625 (1944); United States v. North German Lloyd, 239 F. 587 (S.D.N.Y.1917); The Elsie, supra. Compare, United States v. Henry Steers, Inc., 8 F.Supp. 363 (S.D.N.Y.1934). Even if Barge No. 125 was improperly moored, either as to place or manner of mooring, this would be additional negligence on the part of Potomac constituting another proximate cause of the injury and would not affect ultimate liability in the case.

The Court concludes that Barge No. 125 and the Tug Keystone are liable for the damage to the cable. Counsel may report to the Court a convenient date for assessment of damages.