AMERICAN TELEPHONE &
TELEGRAPH CO., et al.
Plaintiffs,

v.

M/V CAPE FEAR and M/V LITTLE
GULL, their engines, boilers, fishing
gear, etc. In Rem, and American Origi-
nal, Inc., Little Gull, Inc., and Gifford
Marine, Inc., Defendants.

In the Matter of the Complaint of GIF-
FORD MARINE INC. as Owner of
the F/V CAPE FEAR, Petitioner,

For Exoneration from or
Limitation of Liability.

In the Matter of the Complaint of GIF-
FORD MARINE INC. as Owner of
the F/V LITTLE GULL, Petitioner,

For Exoneration from or
Limitation of Liability.

Civ. A. No. 89–3438 (JHR).

United States District Court,
D. New Jersey.

May 1, 1991.

Hill, Rivkins, Loesberg, O'Brien, Mulroy
& Hayden by Douglas R. Burnett, Anthony
J. Pruzinsky and Frances C. Peters, New-
ark, N.J., for plaintiffs/claimants.

Krusen, Evans and Byrne by Peter H.
Bach and Mary Elisa Reeves, Collings-
wood, N.J. for defendants/petitioner.

## OPINION

RODRIGUEZ, District Judge:

Presently before the Court is a motion by
the plaintiffs/claimants for a judgment on

the pleadings, pursuant to Fed.R.Civ.P. 12(c), on the issue of the validity of the defendants'/petitioner's affirmative defense based on the Limitation of Liability Act, 46 U.S.C.A. §§ 181–89 (West 1958 & Supp.1990). In the alternative, plaintiffs/claimants request dismissal of the petitioner's complaint for non-compliance with provisions of the Limitation of Liability Act, or that security be increased to include the value of freight, and that defendants post a bond in place of letters of guarantee. For the following reasons, this Court finds that the Limitation of Liability Act is inapplicable to actions for civil damages brought under the Submarine Cable Act, 47 U.S.C.A. §§ 21–39 (West 1962 & Supp.1990). Therefore, the stay applied against plaintiffs'/claimants' suit, pursuant to our Order of October 30, 1990, is lifted and plaintiffs may proceed with their action to recover the full amount of damages against the defendants.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs/claimants in this action include public companies, incorporated in the United States or in foreign countries, and agencies or ministries of national governments of foreign countries, which are co-owners of a buried submarine international telecommunications cable, named TAT–7, which lands in Tuckertown, New Jersey and Land's End, England.[1] Defendants M/V Cape Fear and M/V Little Gull are two fishing trawlers, and American Original, Inc. and Little Gull, Inc. are their registered owners, respectively. Defendant/petitioner Gifford Marine, Inc. ("Gifford Marine"), indicated as owner of the trawlers according to applications filed with the National Marine Fishery Service, operates out of a marina in Atlantic City,

New Jersey, and owns a fleet of vessels which engages in clam dredging in the Atlantic Ocean.

The facts in this action, as alleged by plaintiffs/claimants in their Amended Complaint, are not complex. At approximately 4:42 a.m. on August 10, 1989, the TAT–7 cable was cut in half approximately 43 miles off the coast of New Jersey. At 6:30 a.m. on August 10, 1989, defendants M/V Cape Fear and M/V Little Gull were sighted approximately one half mile from the cable break with their dredging equipment submerged in the water. No other vessels with equipment capable of splitting the cable were spotted in the area. Subsequent camera photography has indicated that the damage to the cable was caused by mechanical contact, indicated by repeated furrows crisscrossing the cable in at least eight places. TAT–7 is indicated on nautical navigation charts so as to warn ships to avoid damaging the cable.

On August 14, 1989, plaintiffs/claimants filed suit against the defendants alleging that one or both of the defendant vessels split the cable with their dredging equipment which constitutes a violation of United States maritime tort law, the Submarine Cable Act of 1888, 47 U.S.C. §§ 21–39 ("Cable Act"), certain international treaties as well as customary international law and request compensation for damages consisting of repair costs and other consequential damages. On that date, this Court issued warrants of arrest for the M/V Cape Fear and M/V Little Gull. However, in lieu of an in rem arrest, plaintiffs agreed to accept a bond or other permissible security.

In their Amended Complaint, filed November 1, 1989, plaintiffs added a second cause of action alleging that defendants have not complied with the agreement to promptly post security and therefore fur-

---

1. The named plaintiffs in the Amended Complaint consist of two American corporations, six companies affiliated with foreign sovereigns and the Federal Republic of Germany. Plaintiffs contend that there are a total of 28 American and foreign entities, both private and public, which are co-owners of TAT–7, and that plaintiff AT & T brings this suit on their behalf for the recovery of repair costs. Amended Complaint, ¶¶ 15–16. In addition, AT & T and 16 other co-owners, including 13 foreign sovereigns, as defined in the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1603(a), (b), have filed claims for satellite and terrestrial restoration and lost revenue in these proceedings. The total amount of damage claimed by all the cable owners is approximately $3,500,-000.00. Affidavit of Douglas R. Burnett in Support of Motions Pursuant to Fed.R.Civ.P. 12(c) and Supp. Fed.R.Civ.P. F(7), at 1.

ther request, *inter alia*, that the vessels be arrested and sold to satisfy the plaintiffs' claims.

On October 30, 1989, Defendant Gifford Marine Inc. ("petitioner") filed two Complaints for Exoneration from or Limitation of Liability ("petitions"), pursuant to the security provisions of the Limitation of Liability Act of 1851, 46 U.S.C. §§ 181–189 ("Limitation Act"), and Supp. Fed.R.Civ.P. F,[2] in which it claimed, *inter alia*, that even if it is found liable as owner of the F/V Cape Fear and/or the F/V Little Gull, its liability is limited by the Limitation of Liability Act to $590,000.00, the value of its interest in the F/V Cape Fear and $500,-000.00, the value of its interest in the F/V Little Gull, at the time of the alleged incident. Gifford Marine then filed a Motion for Ad Interim Stipulation declaring then it was posting security with the Court in these amounts in the form of a letter of undertaking executed on behalf of St. Paul Fire & Marine Insurance Co.

On January 23, 1990, plaintiffs/claimants filed claims and answers to Gifford Marine's petitions, maintaining, *inter alia*, that the break in the cable was caused by faulty acts of the defendant vessels in violation of the Submarine Cable Act and international law. They further assert that such law supersedes any liability limitation allowed to Gifford Marine provided by the Limitation Act. Furthermore, they contend that there should be no limitation to liability because Gifford Marine has offered insufficient security in both form and amount, in violation of Supp.Fed.Civ.P.F. They, therefore, request that Gifford Marine's Complaints for Exoneration from or Limitation of Liability be denied and that the court enter judgment against the defendants/petitioner for all damages and costs to plaintiffs/claimants. On April 2, 1990, the three actions were consolidated.[3]

Claimants bring this motion for a judgment on the pleadings, on the single issue as to whether petitioner's liability, if any, arising from the break in the TAT–7 cable on August 10, 1989, may be limited, pursuant to 46 U.S.C. § 183(a).

## II.  LEGAL DISCUSSION

Claimants demand a judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c). On ruling on a Rule 12(c) motion, a court "must accept as true all of the well pleaded facts alleged in the complaint and may not dismiss the action [or claim] unless the court is convinced that 'the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). Consequently, for purposes of this motion, we accept as true Gifford Marine's assertions that the alleged misconduct was done without its "privity or knowledge."

This court has jurisdiction pursuant to United States Constitution article III, § 2, cl. 1;[4] 28 U.S.C.A. § 1333 (West 1966 and Supp.1991); 47 U.S.C. § 33, the jurisdictional statute of the Submarine Cable Act, and 46 U.S.C.A. App. § 740 (West 1975 & Supp. 1991).[5] *See Diamond State Tel. Co. v.*

---

**2.** Also referred to as the Supplemental Rules for Certain Admiralty and Maritime Claims.

**3.** Because this motion is formally brought in the limitation proceeding, the co-owners of the cable will be referred to as "claimants," and Gifford Marine Inc. will be referred to as "petitioner."

**4.** This section provides that "the judicial Power [of the federal courts] shall extend to all Cases in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; ... [and] to all Cases of admiralty and maritime Jurisdiction; ..."

**5.** Plaintiffs/claimants, in their Amended Complaint, neglected to cite to the Admiralty Extension Act, 46 U.S.C.A. App. § 740 as a basis for federal jurisdiction. However, this section is clearly applicable and provides that:

The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

In any such case suit may be brought in rem or in personam according to the principles of law and the rules of practice obtaining in cases where the injury or damage has been

*Atlantic Refining Co.,* 205 F.2d 402, 406 (3d Cir.1953); *Offshore Tel. Co. v. M/V Waterbuck, M/V State Point,* 465 F.Supp. 1160, 1163 (E.D.La.1979); *All America Cables & Radio, Inc. v. The Dieppe,* 93 F.Supp. 923 (S.D.N.Y.1950).

## A. The Legislative Acts

### 1. The Limitation of Liability Act of 1851

The Limitation of Liability Act, 46 U.S.C. §§ 181–195 (originally enacted as the Act of March 3, 1851, ch. 43, 9 Stat. 635) allows the owner of a vessel, liable for damages, to consolidate all claims arising out of an incident and to limit his total liability. *See e.g.,* 46 U.S.C. §§ 183, 185; Supp.Fed.R.Civ. P.F. In particular, 46 U.S.C. § 183(a) provides, in relevant part:

> The liability of the owner of any vessel, whether American or foreign ... for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for subsection (b) of this section [increasing the limitation amount for cases involving loss of life or bodily injury], exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

The Limitation of Liability Act was enacted in order to protect, and to encourage investment into, the emerging American shipping industry so as to bolster its competitiveness in the mid-Nineteenth Century particularly with respect to British shipping merchants, who were already protected by a similar English statute. *See University of Texas Medical Branch at Galveston v. United States,* 557 F.2d 438, 454 (5th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978); *In re Complaint of Dillahey,* 733 F.Supp. 874, 875 (D.N.J.1990); G. Gilmore & C. Black, *The Law of Admiralty* 820–21 (2d ed. 1975) ("Gilmore & Black"). However, as noted *infra,* there has been strong criticism of continuing the protections afforded by the Act and many courts have acted to circumscribe its applicability.

### 2. The Submarine Cable Act of 1888

International submarine cables, such as TAT–7, are governed and protected by international treaties, to which the United States is a ratifying party, including the International Convention for the Protection of Submarine Cables, 24 Stat. 989–1000 (14 March 1884), 25 Stat. 1424 (1 December 1886), 25 Stat. 1425 (7 July 1887), T.S. 380 ("Cable Convention"),[6] and the Geneva Convention on the High Seas, 13 U.S.T. 2312, T.I.A.S. 5200, 450 U.N.T. 82 (29 April 1958) ("Geneva Convention") as well as customary international law.[7] Article 2 of

---

done and consummated on navigable water ...

This provision was enacted in response to the Second Circuit decision in *United States v. The John R. Williams,* 144 F.2d 451, 453–54 (2d Cir.), *cert. denied sub nom., Great Lakes Dredge & Dock Co. v. United States,* 323 U.S. 782, 65 S.Ct. 271, 89 L.Ed. 625 (1944), which found that an admiralty court had no jurisdiction for damages caused by a tug to a submarine telephone cable laid in navigable water, because the cable was considered a "structure on land." *See All America Cables & Radio, Inc. v. The Dieppe,* 93 F.Supp. 923, 923 (S.D.N.Y.1950).

**6.** The Cable Convention had been adopted in 40 nations as of 1986 and is generally considered to be customary international law. Restatement (Third) of the Foreign Relations Law of the United States § 521 comment f and reporter's note 4 (1987) ("Restatement (Third)").

**7.** The Geneva Convention, particularly Articles 26–30, simply reaffirmed the protection afford-

ed to submarine cables. Article 27 states that "[e]very State shall take the necessary legislative measures to provide that the breaking or injury by a ship flying its flag or by a person subject to its jurisdiction of a submarine cable beneath the high seas done wilfully or through culpable negligence, in such a manner as to be liable to interrupt or obstruct telegraphic or telephonic communications, and similarly the breaking or injury of a submarine pipeline or high-voltage power cable shall be a punishable offence ..." Article 30 provides that "[t]he provisions of this Convention shall not affect conventions or other international agreements already in force, as between States Parties to them." Article 30 was included to ensure that the protections of submarine cables afforded by the 1884 Cable Convention were still in effect. *See Conventions on the Law of the Sea: Hearings Before the Foreign Relations Committee of the Senate,* 86th Cong., 1st Sess. 92 (1960).

the Cable Convention states, in pertinent part, that "[t]he breaking or injury of a submarine cable, done willfully or through culpable negligence, and resulting in the total or partial interruption or embarrassment of telegraphic communication, shall be a punishable offense, but the punishment inflicted shall be no bar to a civil action for damages."

In 1888, the United States Congress enacted the Submarine Cable Act, 47 U.S.C. §§ 21–39 ("Cable Act"), to give effect to the Cable Convention.[8] *See The Over the Top,* 5 F.2d 838, 845 (D.Conn.1925). The Cable Act applies only "outside of the territorial waters, to all legally established submarine cables landed in the territories, colonies or possessions of one or more" of the signatories to the Cable Convention. 47 U.S.C. § 32; Cable Convention, Article 1.

47 U.S.C. §§ 21 and 22 provide criminal penalties, including fines and imprisonment, for persons who "willfully and wrongfully," or "by culpable negligence," damage submarine cables so as to "interrupt or embarrass, in whole or in part, telegraphic communication."[9] 47 U.S.C. § 28 states that "[t]he penalties provided in sections 21–33 of this title for the breaking or injury of a submarine cable shall not be a bar to a suit for damages on account of such breaking or injury." Finally, 47 U.S.C. § 33 affords the federal district court jurisdiction "over all offenses against sections 21–33 of this title and of all suits of a civil nature arising thereunder, whether the infraction complained of shall have been committed within the territorial waters of the United States or on board a vessel of the United States outside of said waters ..."[10]

Petitioner maintains that the Cable Act is solely a criminal statute and does not provide a private cause of action for civil damages in addition to those provided through non-statutory federal maritime tort law and that, therefore, it must be afforded a limitation on any imposed liability. Claimants assert that "[t]he damages incurred here arise precisely from an injury against which the applicable law, both national and international, seeks to protect and makes subject to criminal sanction." They argue that because this action falls within the purview of the Cable Act, and because the Cable Act is criminal in nature, implements an international treaty obligation of the United States, and is subsequent to, and

---

**8.** Congress derives its authority to regulate and protect the use of international telephone cables pursuant to Article I of the United States Constitution which affords Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes; ... [t]o establish Post Offices and post Roads; ... [and] [t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations ..." *See Pensacola Telegraph Company v. Western Union Telegraph Company,* 96 U.S. 1, 9, 24 L.Ed. 708 (1877).

**9.** These two provisions state, in their entirety:

Section 21. Any person who shall willfully and wrongfully break or injure, or attempt to break or injure, or who shall in any manner procure, counsel, aid, abet, or be accessory to such breaking or injury, or attempt to break or injure, a submarine cable in such manner as to interrupt or embarrass, in whole or in part, telegraphic communication, shall be guilty of a misdemeanor, and, on conviction thereof, shall be liable to imprisonment for a term not exceeding two years, or to a fine not exceeding $5,000, or to both fine and imprisonment, at the discretion of the court.

Section 22. Any person who by culpable negligence shall break or injure a submarine cable in such manner as to interrupt or embarrass, in whole or in part, telegraphic communication, shall be guilty of a misdemeanor, and, on conviction thereof, shall be liable to imprisonment for a term not exceeding three months, or to a fine not exceeding $500, or to both fine and imprisonment, at the discretion of the court.

**10.** We note the apparent inconsistency between the limited applicability of the Cable Act to damages to submarine cables "outside of the territorial waters [of the signatory states]," 47 U.S.C. § 32 (applying Article 1 of the Cable Convention), and federal jurisdiction over infractions "within the territorial waters of the United States." 47 U.S.C. § 33. However, because the instant action concerns events which occurred in international waters, *see United States v. Postal,* 589 F.2d 862, 869 (5th Cir.) (customary international law deems the high seas to lie beyond territorial seas, which extend three miles from the shore), *cert. den.,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); Restatement (Third) § 511 (territorial seas extend twelve nautical miles from coast), we need not concern ourselves with this matter at present.

more specific than, the Limitation Act, then it supersedes the latter statute and no liability limitation applies.

B. *A Survey of Federal Case Law Concerning Limitation of Liability for Damages Caused to Submarine Cables*

The parties have not cited to, nor has our research uncovered, any case discussing the applicability of the Limitation of Liability Act to an action brought pursuant to the Submarine Cable Act. A number of courts have found liability against a party who damaged an underwater telephone or telegraph cable. However, nearly all of these cases omitted any discussion of, and did not implicate, the Submarine Cable Act, apparently finding a cause of action for civil damages under general maritime tort law. Neither did they discuss whether liability should be limited nor whether the Limitation Act applied. *See e.g., Canadian Pacific Railway Co. v. United States,* 272 F.2d 913 (9th Cir.1959); *Diamond State Telephone Co. v. Atlantic Refining Co., supra; United States v. The John R. Williams, supra; Offshore Tel. Co. v. M/V Waterbuck, M/V State Point, supra; New York Telephone Co. v. Cities Service Transp. Co.,* 23 F.Supp. 426 (E.D.N.Y. 1938); *The Elsie,* 288 F. 575 (N.D.Cal.1923); *The Vindeggen,* 252 F. 209 (D.Md.1918); *Postal Telegraph Cable Co. v. P. Sanford Ross,* 221 F. 105 (E.D.N.Y.1915).[11]

Petitioner contends that courts have permitted the application of the Limitation Act to cases involving damages to underwater cables. In *American Telephone & Telegraph Co. v. Steuart Transportation Co.,* 1978 A.M.C. 1680 (D.Md.1977), the court found a tug liable for crushing two submarine telephone cables across the Rappahannock River in Virginia. The court implicated the Limitation Act, but did not limit the defendant ship owner's liability because the owner was not able to prove

that the damage was caused by acts or conditions without its privity or knowledge. In *Petition of Potomac Sand and Gravel Co.,* 253 F.Supp. 268 (D.Md.1966), a petition for exoneration or limitation of liability, the court found that a tug, which pushed or pulled a barge, was liable for damage to submarine power cables where the anchor of the barge damaged a cable in a navigable creek in Maryland. However, liability limitation was not an issue as the value of the owner's interest in tug was greater than the amount of damages. *See also The Russell No. 6,* 42 F.Supp. 904, 906 (E.D.N.Y.1941) (petitioner's right to exoneration established in action where anchor of ship damaged submarine oil pipe lines laid on the bottom of Arthur Kill, between New York and New Jersey). Nevertheless, these cases, like those *supra,* neither applied nor discussed the Cable Act [12] nor any other federal statute.

Finally, we note that in over 100 years since the enactment of the Submarine Cable Act, only two cases for civil damages have discussed the Act in any detail and no case has been brought under the criminal provisions of the Act. In *The William H. Bailey,* 100 F. 115 (D.Conn.1900), *aff'd,* 111 F. 1006 (2d Cir.1901), the court found that a ship was liable for damaging an ocean cable where its officers cut the cable to free the anchor of the boat in Gowanus Bay, New York. The court, citing the Submarine Cable Act and the Cable Convention, stated that the vessel "should be held guilty either of willful injury or culpable negligence." 100 F. at 117. Although the court did not cite to section 8 of the Cable Act (now codified as 47 U.S.C. § 28), it allowed $5,000 in civil damages to the cable owner, a private party. Subsequently, the court in *United States v. North German Lloyd,* 239 F. 587 (S.D.N.Y.1917) found that a steamship was liable for civil damages where its anchor caused damage to

---

**11.** *The John R. Williams, P. Sanford Ross,* and *New York Telephone* also discussed whether the court could maintain admiralty jurisdiction over the matter, which depended on whether submarine cables, which landed on the shore, were to be considered "structures on land." This issue was resolved by Congress in enacting 46 U.S.C.A. App. § 740. *See* supra note 5.

**12.** This may have been because each case occurred in the internal waters of the United States, *see* Restatement (Third) § 511 comment e, and not on the high seas, thereby rendering the Cable Act inapplicable. *See* supra note 10.

submarine cables running between Ft. Wadsworth and Ft. Hamilton in New York harbor. The court merely cited to section 4 of the Cable Act (47 U.S.C. § 24) that it is a "crime for the master of any vessel to fail in proper observations of the rules and provisions of the [Cable Convention]" and then to section 8 of the Cable Act (47 U.S.C. § 28) that civil damages may still be awarded notwithstanding the criminal penalties provided in the Act. 239 F. at 589.

Because existing case law does not directly address the issue, we must undertake a two-step inquiry. First, may a private civil right of action be implied under the Submarine Cable Act? Second, does the Submarine Cable Act supersede any inconsistent provisions of the Limitation of Liability Act so as to prohibit any limitation on the amount of damages which may be imposed upon an owner of a vessel which is found to have violated the Cable Act, notwithstanding the lack of "privity or knowledge" of the owner? [13]

C. *Is There a Private Civil Cause of Action Implied Under the Submarine Cable Act?*

██ The Submarine Cable Act states that "[t]he penalties provided in sections 21–33 of this title for the breaking or injury of a submarine cable shall not be a bar to a suit for damages on account of such breaking or injury." 47 U.S.C. § 28. This provision does not expressly create a private civil right of action, but merely prevents the express criminal penalties contained in the Act from prohibiting such a remedy. Therefore, we must determine whether there is an implied civil right arising under the Act.

In *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975), the United States Supreme Court laid out four factors which a court should consider in deciding whether a private remedy should be implied in a statute not expressly providing for one:

1) "is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted'—that is, does the statute create a federal right in favor of the plaintiff?"

2) "is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?"

3) "is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?"

4) "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?"

(citations omitted) (emphasis in original).

Although the Supreme Court has considered all four factors in determining whether an implied right exists, *see e.g., Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (implied private cause of action found under 20 U.S.C. § 1681), the Court has noted that legislative intent is of paramount importance. "In determining whether to infer a private cause of action from a federal statute, our focal point is Congress' intent in enacting the statute ... this 'intent may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment.'" *Thompson v. Thompson*, 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988) (finding no private right of action under the Parental Kidnapping Prevention Act of 1980, 28 U.S.C. § 1738A, to determine which of two conflicting state custody decisions is valid) (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979)). *See also Plucinski v. I.A.M. National Pension Fund*, 875 F.2d 1052, 1055 (3d Cir.1989). Indeed, if legislative intent is not found then courts need not consider the other *Cort* factors. *Touche Ross & Co. v. Red-*

---

**13.** Although, in undertaking this analysis, we are sailing into uncharted waters of maritime jurisprudence, we aim to stay leeward of aquatic puns, while, perhaps, adopting their underlying rationale. *See e.g., University of Texas*, 557 F.2d at 455 ("Although we juridically transport

ourselves to the nineteenth century—no mean navigational feat—we must not lose our contemporary compass. The shifting sands of time demand innovative interpretative analysis lest we come to rest on a shoal that did not threaten our grandfathers, but is only newly formed").

*ington,* 442 U.S. 560, 576, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979).

The Cable Act is essentially a criminal statute. It expressly authorizes criminal penalties or prison terms for violators. We realize that not every criminal statute will provide a civil remedy for the injured party, *see Transamerica Mortgage Advisors,* 444 U.S. at 24, 100 S.Ct. at 249, and that "[w]hen Congress intends private litigants to have a cause of action to support their statutory rights, the far better course is for it to specify as much when it creates those rights. But the Court has long recognized that under certain limited circumstances the failure of Congress to do so is not inconsistent with an intent on its part to have such a remedy available to the persons benefitted by its legislation." *Cannon,* 441 U.S. at 717, 99 S.Ct. at 1968 (cited in *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 374, 102 S.Ct. 1825, 1837, 72 L.Ed.2d 182 (1982)).

*Cort* itself addressed the issue as to whether a civil remedy could be implied from a criminal statute. The court stated that an implied private civil cause of action for damages may be found where there is also a criminal sanction when "there [is] at least a statutory basis for inferring that a civil cause of action of some sort lay in favor of someone." 422 U.S. at 79, 95 S.Ct. at 2088 (citing *Wyandotte v. United States,* 389 U.S. 191, 201–02, 88 S.Ct. 379, 385–86, 19 L.Ed.2d 407 (1967)). However, in *Cort,* there was only "a bare criminal statute, with absolutely no indication that civil enforcement of any kind was available to anyone." 422 U.S. at 79–80, 95 S.Ct. at 2089. Consequently, the *Cort* court did not find a implied cause of action for a corporate shareholder against corporate directors under 18 U.S.C. § 610, because shareholders were not one of the primary persons to be protected by the Act, there was no legislative intent that they had a private right, providing such a right would not further the primary purpose of the law, and the plaintiff had an adequate state law remedy. 422 U.S. at 80–85, 95 S.Ct. at 2089–91.

Applying the *Cort* factors and subsequent Supreme Court case analyses, several lower courts have failed to imply a private cause of action under a statute providing criminal penalties, primarily because the law was considered a "bare criminal statute" and/or because there was no indication of legislative intent to create such a right. *See e.g., Flowers v. Tandy Corp.,* 773 F.2d 585 (4th Cir.1985) (18 U.S.C. § 2512); *Marx v. Centran Corp.,* 747 F.2d 1536 (6th Cir.1984) (12 U.S.C. § 93(b)(4)), *cert. den.,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985); *United States v. Ohio Barge Lines, Inc.,* 607 F.2d 624, 630 (3d Cir.1979) (no private right for government, under 33 U.S.C. § 409, to recover costs of removal of innocently sunken vessel); *Ryan v. Ohio Edison Co.,* 611 F.2d 1170 (6th Cir.1979) (18 U.S.C.A. § 1341); *Olsen v. Shell Oil Co.,* 561 F.2d 1178 (5th Cir. 1977) (43 U.S.C. §§ 1333, 1334); *Creech v. Federal Land Bank of Wichita,* 647 F.Supp. 1097 (D.Col.1986) (18 U.S.C. § 1341, 15 U.S.C. § 77q, 12 U.S.C. § 2001 *et seq.*); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith,* 669 F.Supp. 1244 (S.D.N.Y.1987) (New Mexico Stat.Ann. § 30–28–2); *Lamont v. Haig,* 539 F.Supp. 552 (D.S.D.1982) (18 U.S.C. §§ 2, 241, 371, 1385).

However, other courts have found an implied right in a statute providing criminal penalties in several instances where the legislative history indicated Congressional intent for such a remedy, the primary purpose of the statute was to protect a certain class of persons and/or implying this right furthered the aims of the law. *See e.g., Stepanischen v. Merchants Despatch Transportation Corp.,* 722 F.2d 922 (1st Cir.1983) (45 U.S.C. § 152 Fourth); *Leist v. Simplot,* 638 F.2d 283 (2d Cir.1980) (7 U.S.C. §§ 1–19), *aff'd sub nom., Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).

We are aware that we should be careful in finding an implied right under a federal statute, since "[t]he federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." *California v. Sierra*

*Club,* 451 U.S. 287, 297, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981). *See also Transamerica Mortgage Advisors,* 444 U.S. at 19, 100 S.Ct. at 246–47; *Thompson,* 484 U.S. at 189–90, 108 S.Ct. at 521–22 (Scalia, J., concurring). Nonetheless, applying the *Cort* test, with a primary consideration on legislative intent, we hold that the Submarine Cable Act provides a private civil remedy for submarine cable owners against parties who allegedly damage such cables.

As this matter is one of statutory construction, we begin with the language of the Cable Act. *See Transamerica Mortgage Advisors,* 444 U.S. at 16, 100 S.Ct. at 245–46. The statute expressly provides only for criminal penalties and imprisonment for violations of its terms. *See* 47 U.S.C. §§ 21, 22, 24, 25, 27, and 37. As noted *supra,* 47 U.S.C. § 28, only prohibits any of the criminal penalties from barring a "suit for damages on account of such breaking or injury." This clause derives from Article 2 of the Cable Convention which provides that criminal "punishment inflicted shall be no bar to a civil action for damages." One court analyzed similar language in a statute providing criminal penalties and injunctions in favor of a federal agency, which included the provision that "... the [criminal] proceedings provided for by ... this title shall not preclude the bringing of a suit for the recovery of damages by any party injured, or any other actions provided by said Act ..." *Bloomer Shippers Association v. Illinois Central Gulf Railroad Co.,* 655 F.2d 772, 778 (7th Cir.1981). The court noted that this clause "does not create a private cause of action but merely establishes that government enforcement proceedings do not bar injured parties from bringing authorized damage suits." *Id.* If the only possible foundation for ascertaining legislative intent to provide an implied civil remedy relied upon section 28, we might agree with the *Bloomer Shippers Association* court.

However, 47 U.S.C. § 33 provides that "[t]he district courts of the United States shall have jurisdiction over all offenses against sections 21–33 of this title and *of all suits of a civil nature arising thereun-*

*der* ... suits of a civil nature may be commenced in the district court for any district within which the defendant may be found and shall be served with process" (emphasis added). Although embedded within the jurisdictional and venue provision, this phrase indicates that Congress intended that a private right of action be brought pursuant to the Act.

Furthermore, the legislative history indicates that Congress was well aware of this jurisdictional provision. Originally, this clause excluded any mention of criminal jurisdiction and provided "[t]hat the district courts shall have jurisdiction of all suits of a civil nature arising under this act ..." H.R. 9324, 49th Cong., 1st Sess. (1886). This provision was later deleted and the present clause added to the bill during its Senate debate. Cong.Rec. S1403–04 (1888). *Compare Thompson, supra* (no implied right of action found because there was legislative history which indicated that Congress specifically rejected a proposal that federal courts enforce the applicable statute).

The legislative history of the statute indicates that it was "to carry into effect the international convention of the 14th day of March, 1884, for the protection of submarine cables." *See* H.R.Rep. No. 524, 50th Cong., 1st Sess. (1888). It is interesting to note that two provisions of the Cable Convention expressly provide for civil remedies. Article 4 states that the owner of a cable who damages another cable when repairing or laying the first cable, shall pay the cost of repairs, in addition to any other criminal or civil claim. Article 7 affords indemnification for owners of ships, against the cable owner, who have lost an anchor or any fishing gear so as not to damage a cable. However, these express civil damage provisions were not adopted into the Cable Act. There is no legislative history discussing these omissions. However, this does not indicate that Congress intended to exclude civil remedies under the Cable Act, but, rather, that Congress decided not to specify certain civil damage claims and intended that all types of civil

suits for damages would be brought pursuant to the Act.

The instant action is distinguishable from those cases which did not find evidence of an implied right from the language of a jurisdictional statute. In *Shoultz v. Monfort of Colorado, Inc.*, 754 F.2d 318, 323 (10th Cir.1985), *cert. den.*, 475 U.S. 1044, 106 S.Ct. 1259, 89 L.Ed.2d 569 (1986), the court did not find an implied right where the statute, 21 U.S.C. § 674, provided jurisdiction to the district court "to enforce, and to prevent and restrain violations of, this chapter, and ... in all other kinds of cases arising under this chapter," because the jurisdictional clause must have related to express civil enforcement proceedings. Similarly, *Touche Ross, supra*, did not find evidence of a private right implied under § 17(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78q(a), where the jurisdictional and venue provision of the Act, 15 U.S.C. § 78aa, provided that "[t]he district courts of the United States ... shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder ..." In both cases, the courts found that such language only granted jurisdiction over authorized civil actions, because "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Touche Ross*, 442 U.S. at 572, 99 S.Ct. at 2487. However, here, the phrase "civil actions arising thereunder" must refer to implied rights, because there are no other clauses expressly providing for such actions. Although we are aware that an implied right must be found under the substantive provisions of a statute, *see Touche Ross*, 442 U.S. at 576–77 and n. 17, 99 S.Ct. at 2489–90 and n. 17, the jurisdictional language may be evidence of legislative intent to provide such a right.

Furthermore, we are supported in our conclusion by the reasoning contained in cases relied upon by *Cort*,[14] particularly *Wyandotte v. United States, supra*, which found an implied civil cause of action by the government to recover the costs of removing sunken vessels under a statutory provision, 33 U.S.C. § 409, for which only criminal penalties against the owner were expressly provided.

*Wyandotte* concerned two consolidated actions involving the negligent sinking of barges in two separate incidents on the Mississippi River. The court first noted that the Rivers and Harbors Act of 1899, 33 U.S.C.A. §§ 401–467n (West 1986 and Supp.1990), is to be given a broad reading in order to effectuate its purpose of "prevent[ing] obstructions in the Nation's waterways," and that "a principal beneficiary of the Act, if not the principal beneficiary is the Government itself." 389 U.S. at 201.

The court next stated that in many situations the criminal penalties, provided under 33 U.S.C. § 411, in addition to any in rem recovery permitted by 33 U.S.C. § 414, would be inadequate to reimburse the government for removal expenses. 389 U.S. at 202, 88 S.Ct. at 386. Even the additional punishment of a prison term would be an unsatisfactory "remedy for the pecuniary injury which the negligent shipowner may inflict upon the sovereign." *Id.* Thus, the court held that the Government could "seek an order that a negligent party is responsible for rectifying the wrong done to maritime commerce by a § 15 [33 U.S.C. § 409] violation. Denial of such a remedy to the United States would permit the result, extraordinary in our jurisprudence, of a wrongdoer shifting responsibility for the consequences of his

---

**14.** *Cort* also relied upon *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), a shareholder derivative action, in which the Court found a private right of action under § 14(a) of the Securities Exchange Act of 1934. The court held that a statute, whose purpose was to protect a certain class of persons, "implies the availability of judicial relief where necessary to achieve that result," *Id.*, 377 U.S. at 432, 84 S.Ct. at 1559–60, and that courts must "provide such remedies as are necessary to make effective the congressional purpose." *Id.*, 377 U.S. at 433, 84 S.Ct. at 1560. However, we recognize that the Supreme Court now focuses more on legislative intent and less on whether a certain remedy may further the Congressional purpose. *See Touche Ross*, 442 U.S. at 576–78, 99 S.Ct. at 2489–90.

negligence onto his victim. It might in some cases permit the negligent party to benefit from commission of a criminal act. We do not believe that Congress intended to withhold from the Government a remedy that ensures the full effectiveness of the Act." 389 U.S. at 204, 88 S.Ct. at 387.

Finally, the court noted that "[i]t seems highly unlikely that Congress, having specified that only a negligent or intentional sinking is a crime, would then employ [language that provides a remedy for both negligently and accidentally sunken ships] to grant the culpable owner a personal civil immunity from the consequences of that crime." 389 U.S. at 207, 88 S.Ct. at 388. Thus, the court held that the Government had an implied right to in personam relief against the owner of a vessel, under 33 U.S.C. § 409, for the negligent sinking of a vessel in navigable waterways and is not limited to the express in rem recovery against the abandoned vessel and criminal penalties against the owner, because "[t]here is no indication ... that Congress might have intended that a party who negligently sinks a vessel should be shielded from personal responsibility." 389 U.S. at 200, 88 S.Ct. at 385 (citing *United States v. Republic Steel Corp.*, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960)).

We conclude that the Rivers and Harbors Act is sufficiently analogous to the Submarine Cable Act and that the *Wyandotte* holding and analysis controls our issue. The Cable Act also must be read broadly to effectuate its purpose of protecting international submarine cables. The importance of this goal is reflected in two international treaties and domestic implementing legislation expressly providing criminal penalties for its violation. Furthermore, the cable owners must be considered a principal beneficiary of the Act. The overriding purpose of the Cable Convention is to safeguard communication between nations which is vital for international security and commerce and is clearly advantageous to the public at large. However, only by providing a civil remedy for those with the most immediate interest in the safety of the cables—their owners—will this international policy be accomplished. Moreover, it is clear that the criminal penalties provided in the Cable Act are insufficient to be of significant deterrence to violators of the Cable Act. And, unlike the Rivers and Harbors Act, the Cable Act provides no express civil remedies of any sort to compensate the injured party. Only by implying a private civil right under the Act so as to compensate the injured cable owner will the legislative purpose of the Act be realized.

Applying the relevant *Cort* factors,[15] we find that Congress intended a private remedy and that the owners of the cables are the class for whom this protection is extended. This implied remedy is consistent with the legislative scheme. Moreover, we are not the only court to apply the Cable Act in the civil context. Although the court in *The William H. Bailey, supra*, did not make an express finding as to a private cause of action under the Act, it certainly "relied upon [the Act] as one of the grounds of [civil] liability." *See Postal Telegraph Cable*, 221 F. at 107. Therefore, we hold that there is an implied private civil remedy under the Submarine Cable Act.[16]

---

15. The fourth *Cort* factor—whether an adequate state law remedy exists—"presents no obstacle to implying a remedy, as admiralty law is not an area traditionally relegated to state law." *Ohio Barge Lines, Inc.*, 607 F.2d at 624 n. 12.

16. Claimants also assert that foreign tribunals have found a private cause of action arising from national laws implementing the Cable Convention. Although not relying on such cases, we simply note that they are consistent with the implied remedy we find in the Cable Act. In *The Government of the Netherlands, Post Office v. G. 't Mannetje-Van Dam*, File No. 325/78 (District Court of Rotterdam, decision rendered November 20, 1978), aff'd, File No. 69 R/81 and File No. rb. 325/78 (The Court at the Hague, Second Chamber, decision rendered April 15, 1983) (translated to English), a Dutch court, citing to Article 2 of the Convention, stated that "the Convention creates, besides a criminal liability, also a civil liability." Furthermore, the court noted that Article 8 of the Convention "assigns to national judges mentioned the legal authority to try civil suits involving breaches of this Convention." *Id.* at [11–12 of English translation version]. *See also Alex Pleven*, reported at 9 Whiteman Digest of International Law 948–951 (U.S. State Department

D. *Is the Implied Private Right under the Submarine Cable Act Inconsistent with the Limitation of Liability Act?*

■ This issue requires an analysis of the relationship between the Cable Act and the Limitation Act. In general, statutes on the same subject should be construed to be in harmony if reasonably possible. 2A N. Singer, Sutherland on Statutes and Statutory Construction §§ 51.02, 51.05 (Sands 4th ed. 1984) (hereinafter "Sutherland Stat. Const.") As such, statutes are not to be read "as being in irreconcilable conflict without seeking to ascertain the actual intent of Congress," because " 'repeals by implication are not favored.' " *Watt v. Alaska,* 451 U.S. 259, 266–67, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981) (quoting *Morton v. Mancari,* 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974)). Thus, statutes must be read "to give effect to each" if it can be done so as to "preserv[e] their sense and purpose." *Id.,* (citing *Mancari,* 417 U.S. at 551, 94 S.Ct. at 2483).

■ At the same time, "[a]s a general rule of law when the purposes of two statutes appear to be in conflict with each other, and there is no statutory language which makes any cross-reference, and ... the legislative history is silent as to the possible conflict, it is generally assumed that the later statute constitutes an amendment of the earlier one." *Hines, Inc. v. United States,* 551 F.2d 717, 725 (6th Cir. 1977); Sutherland Stat. Const. §§ 51.02, 51.05. This is particularly true when the later statute specifically concerns a certain subject matter, whereas the previously enacted law pertains to the issue only in general terms. *See United States v. Ohio Valley Co.,* 510 F.2d 1184, 1189 (7th Cir. 1975). *See also La Vallee Northside Civic Assoc. v. Virgin Islands Coastal Zone Management Com.,* 866 F.2d 616, 621 (3d Cir.1989); *Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency,* 824 F.2d 1258, 1278 (1st Cir.1987); *Bowman v. Texas Educational Foundation, Inc.,* 454 F.2d 1097, 1101 (5th Cir.1972); *Panama Canal*

1968) (civil damages found under French law

*Co. v. Compania Nacional de Navegacion, S.A.,* 463 F.Supp. 330, 333–34 (D.Canal Zone 1978). Similarly, and relevant here, "[a] provision of a treaty of the United States that becomes effective as law of the United States supersedes as domestic law any inconsistent preexisting provision of a law or treaty of the United States." Restatement (Third) § 115(2).

■ Petitioner argues that there is simply no inconsistency between the two statutes: claimants may recover civil damages, but any such recovery must be limited to the owner's interest in the vessel and cargo. Claimants argue that the statutes are inconsistent: applying the Limitation Act to private civil suits under the Cable Act will undermine the purposes of the Cable Act and the Cable Convention. They argue that the Cable Act must supersede the Limitation Act because it is a criminal statute, implemented a treaty obligation of the United States, was enacted subsequent to the Limitation Act and is specifically addressed to the subject matter of this case.

Our inquiry is whether each statute may be applied so as to effectuate its purpose, or, alternatively, whether the statutes irreconcilably conflict. The keystone to this issue, as with implied rights, is legislative intent. Unfortunately, there is no legislative history of the Cable Act discussing whether civil damages should be limited. *See* H.R.Rep. No. 524, 50th Cong., 1st Sess. (1888); Cong.Rec. S1403–04 (1888); Cong. Rec. H1445–46 (1888). Petitioners argue that the delicate balancing of policy interests represented by the two Acts must be done by Congress and not the courts. *See Matter of Oswego Barge Corp.,* 439 F.Supp. 312, 320 (N.D.N.Y.1977); *Complaint of Harbor Towing Corp.,* 335 F.Supp. 1150, 1157–58 (D.Md.1971). It further asserts that Congress has amended the Limitation Act several times and has not repealed it nor created further exceptions to the general limitation of liability.

The mere fact that claimants' cause of action arose under a statute does not exclude application of the Limitation of Lia-

enacted pursuant to the Cable Convention).

bility Act. Indeed, as one commentator pointed out, "[m]any attempts have been made to avoid the application of the limitation of liability statutes by the contention that subsequent statutes have, in some manner, impliedly repealed the limitation statutes *pro tanto*." 3 Benedict on Admiralty § 22 at 3–7 (7th ed. revised 1989) ("Benedict on Admiralty"). The Limitation Act has been found applicable in cases also implicating federal and state wrongful death statutes (including the federal Death on the High Seas Act, 46 U.S.C.App. §§ 761–767), the Merchant Marine Act of 1920 (the "Jones Act," 46 U.S.C.App. § 688), the Employers' Liability Act (45 U.S.C. § 51 *et seq.*), the Interstate Commerce Act (49 U.S.C. § 1 *et seq.*), state workmen's compensation laws, state canal and harbor laws, and state anti-pollution laws. *See* Benedict on Admiralty, at 3–7 to 3–14; Gilmore & Black, at 846 n. 45.

However, there are liabilities imposed by other statutes against which the shipowner may not limit. These include foreign wrongful death statutes (through § 4 of the Death on the High Seas Act, 46 U.S.C. App. § 764), statutory penalties under the Clean Water Act (33 U.S.C. §§ 1251–1376)[17], the "Wreck Act" (particularly 33 U.S.C. § 409) included within provisions of the Rivers and Harbors Act of 1899 (33 U.S.C. §§ 401–467n), criminal statutes, seaman's wages (through the Limitation Act itself, 46 U.S.C. § 189), and, possibly, a loss due to a statutory fault or violation of a statutory command.[18] *See* Benedict on Ad-

miralty § 32, at 4–3 to 4–8; Gilmore & Black, at 846 n. 45.

Claimants urge us to apply to the Submarine Cable Act the reasoning of certain cases which have found no limit to liability for violations of the so-called "Wreck Act." The "Wreck Act," consists of portions of the Rivers and Harbors Act of 1899 (now codified as 33 U.S.C. §§ 401–467n), and includes sections 409[19], 411, 412, 414 and 415. "A vessel owner who fails to comply with this statute may not limit his liability for any resulting damage." Benedict on Admiralty § 32 at 4–6 (citing *The Snug Harbor*, 53 F.2d 407 (E.D.N.Y.1931)). In *The Snug Harbor*, two barges collided with a wrecked steamship, owned by the United States, in Block Island Sound, off of Montouk Point Light on Long Island, New York. The court stated that "[t]he Wreck Statute is a criminal statute and the Limitation Statute cannot have any effect in limiting its provisions ... The Wreck Statute is criminal in its nature, and limitation of liability should be refused where the Wreck Statute is violated or a premium would be placed on a violation of the law. Neglect alone predicated on the conduct of the owner does not preclude limitation of liability, but the violation of a statute criminal in its nature does preclude limitation of liability." *Id.*, 53 F.2d at 411.

As noted, *Wyandotte Co. v. United States, supra,* found that the United States had an implied right under 33 U.S.C. § 409 to recover the expenses of removing negligently sunken vessels in navigable waters.

---

17. *See United States v. CF Industries Inc.,* 1982 A.M.C. 2440, 2445 (D.Minn.1982); *In re Complaint of Hokkaido Fisheries Co.,* 506 F.Supp. 631 (D.Alaska 1981).

18. This example must be carefully scrutinized since a broad interpretation of this statement could arguably lay the foundation for an exception to liability limitation for any statutory violation, which is not the law. Benedict on Admiralty § 33 at 4–8 explains this example in that "there may be other statutory faults of such a character as to influence the claim to benefit of the limitation statutes" (citing, *inter alia, The Denali,* 105 F.2d 413 (9th Cir.1939), *adhered to on rehearing,* 112 F.2d 952 (9th Cir.), *cert. den.,* 311 U.S. 687, 61 S.Ct. 65, 85 L.Ed. 444 (1940)). In *The Denali,* the court found that a shipowner who violated 46 U.S.C. §§ 222, 223 "is penalized

with the burden of showing that the violations not only probably did not cause the accident, but that it could not have done so." 105 F.2d at 418. Although this may have altered the evidentiary burden, the Limitation Act was still applicable to the proceeding.

19. This clause provides, in relevant part:

"It shall not be lawful ... to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; ... and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States ..."

Although the *Wyandotte* court expressly left open the question as to whether the Limitation Act is applicable to cases brought under the Wreck Act, *see* 389 U.S. at 205 n. 17, 88 S.Ct. at 388 n. 17, several lower courts have applied the analysis of *Wyandotte* to hold that liability imposed under various provisions of the Rivers and Harbors Act may not be limited. In *United States v. Ohio Valley Co., supra,* the court held that the strict liability imposed for violations of 33 U.S.C. §§ 408 and 412, for damages caused by a barge to a river lock gate, may not be limited. This was due, in part, because applying the Limitation of Liability Act to the Rivers and Harbors Act would be "inconsistent with the purpose of the [latter Act] ... to protect, preserve and make safe the nation's navigable waterways." 510 F.2d at 1188. Similarly, the court in *Hines v. United States, supra,* held that liability found against a shipowner for damages to river improvements caused by a sunken vessel, pursuant to the 33 U.S.C. §§ 408 and 412, may not be limited. Applying the rules of statutory construction, and relying heavily on *Wyandotte,* it found that the later Rivers and Harbors Act provisions amended and superseded the unlimited language of the Limitation of Liability Act. 551 F.2d at 718, 727. It further noted that "[w]hile we expressly disclaim any intention of seeking to avoid the mandate of the 1851 [Limitation of Liability] statute, we do believe that there is no warrant in the facts of the present case for an expansive reading of the Limitation of Liability act which would cripple the effectiveness of the important purposes of the Rivers and Harbors Act." 551 F.2d at 728.

Finally, in *University of Texas Medical Branch at Galveston v. United States, supra,* the court, also relying on *Wyandotte,* found the Limitation Act inapplicable to civil suits brought by the United States, pursuant to 33 U.S.C. § 409, for the costs of wreck removal against parties negligently responsible for the sunken vessel. In that case, liability was imposed against a negligent third-party non-owner which allegedly caused the wreck.

The court noted that "[j]ust as the [*Wyandotte*] court thought § 16's [33 U.S.C. § 411] criminal fine and the in rem recovery authorized by § 19 [33 U.S.C. § 414] insufficient to reimburse the government, so limiting the government to an in rem recovery in a civil suit subject to the Limitation Act would in most cases preclude the government from securing full reimbursement." 557 F.2d at 447. Central to its analysis was the *Wyandotte* rationale that if the government were not fully compensated for removing sunken vessels, then the public would pay the costs of the continuing obstruction of the navigable waterway. 557 F.2d at 450–51. The court also relied on the fact that a violation of 33 U.S.C. § 409 imposed criminal penalties, pursuant to 33 U.S.C. § 411, which may not be limited. 557 F.2d at 453.

In the same manner that the Limitation Act has been "construed ... in the light of subsequently enacted legislation and regulations designed to insure that navigable waterways of the United States will be kept free of obstructions," *see Complaint of Chinese Maritime Trust, Ltd.,* 478 F.2d 1357, 1359 (2d Cir.1973), *cert. denied,* 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 98 (1974), we believe that the Limitation Act must be construed in the light of any later statute regulating and protecting submarine cables. Applying the same rationale as those cases which have found the Rivers and Harbors Act to implicitly limit the Limitation Act, we believe that "[petitioner's] broad construction of the Limitation Act would impair the effectiveness of [the Submarine Cable Act]," *see University of Texas,* 557 F.2d at 455, and that we cannot apply both Acts so as to maintain each Act's "sense and purpose."

Notwithstanding the limited holding of *Wyandotte,* which found an implied right for the government under 33 U.S.C. § 409 for reimbursement of sunken vessel removal costs, subsequent cases applied the public policy bases contained in that opinion to imply that liability should not be limited in an action under the Rivers and Harbors Act, even as to those provisions, such as 33 U.S.C. § 408, which do not impose a "subsequent statutory violation, such as the

duty to remove the wreck [33 U.S.C. § 409, discussed in *Wyandotte*], which the owner could be said to have breached." *University of Texas*, 557 F.2d at 453 n. 21. We found, *supra*, that the *Wyandotte* analysis supports our finding of implied rights under the Submarine Cable Act. We similarly believe that the policy arguments of *Wyandotte* mandate the conclusion that the purposes of the Cable Act and the Limitation Act are incompatible. We hold that the Submarine Cable Act, enacted subsequent to the Limitation of Liability Act and intended to apply to the specific conduct which is the subject matter of this action, implicitly amends inconsistent provisions of the latter Act.

This conclusion is buttressed by the fact that the *Hines, University of Texas,* and *The Snug Harbor* courts all found the Limitation Act inapplicable to cases under certain provisions of the Rivers and Harbors Act, at least partly because the latter statute is criminal in nature. Similarly, the Submarine Cable Act is essentially a criminal statute, expressly providing for criminal penalties in several clauses. "Public policy forbids that a person liable to a fine or penalty under the criminal laws should be permitted to limit or reduce his liability by claiming the benefit of the shipowner's limitation statutes." Benedict on Admiralty § 32, at 4–7. Although this proposition is not directly on point, because petitioner is being sued for civil damages and not criminal penalties, and although we are aware that "public policy does not foreclose limitation for some violations of a statute leading to criminal penalties or fines," *University of Texas*, 557 F.2d at 453 n. 21, we believe that the same public policy rationales apply to this civil action.[20]

As with the government under Wreck Act, it is not mandatory that cable owners repair a damaged cable, even though it will often be in their pecuniary interest to do so to resume service. Nevertheless, as long as the owners are inadequately compensated for the costs involved the broken cable

may not be restored. The likely result of limiting the civil liability of violators of the Cable Act is the abandonment of the submarine cables with the concomitant loss of international communications directly undermining the purposes of the Cable Act and the two international treaties protecting submarine cables. We do not believe that Congress, when it enacted the Submarine Cable Act, intended that the party responsible for damaging internationally protected cables, would be able to shift the expenses of remedying the injury onto the innocent owner, particularly where the precise conduct allegedly at fault in the instant case, negligent damage to a submarine cable on the high seas, is the subject of a criminal fine and prison term.

*Wyandotte* was primarily concerned with not burdening the government, and ultimately the taxpayers, with the expense of remedying damage caused by the negligent party. Although the United States is not a party to the instant action, most of the claimants are public entities in foreign countries and the American claimants are long-distance telephone companies servicing a large portion of the American public. Any repair costs not recoverable from the petitioner will be absorbed by the claimants and passed on, in total or in part, to innocent telephone service consumers or foreign taxpayers.

Cases relied upon by the petitioner may be distinguished. It relies upon two actions which discussed whether strict liability claims brought under state environmental protection laws to protect against oil spills in navigable waters are subject to the Limitation Act. *See Matter of Oswego Barge Corp.*, 439 F.Supp. 312 (N.D.N.Y. 1977), and *Complaint of Harbor Towing Corporation*, 335 F.Supp. 1150 (D.Md. 1971). *Oswego Barge Corp.* found that the claims under state strict liability statutes may be limited because Congress did not intend that such claims be excepted from the Limitation Act, the Supremacy Clause

---

**20.** As in *University of Texas, supra,* we do not want to adopt a per se rule that civil violations of statutes that are essentially criminal in nature necessarily preclude any limitation of liability. We merely note that the policy justifications are analogous and that, at least for purposes of the Cable Act, civil liability should not be limited.

mandated that federal law applies, and the state statute was remedial and not criminal in nature. *Harbor Towing Corp.* also relied on the Supremacy Clause and the fact that it was not clear whether the duty to clean up oil spills was criminal. Here, both Acts are federal. The Supremacy Clause is not implicated and the Submarine Cable Act is essentially a criminal statute, making illegal the precise activity which is the subject of this civil action.

Petitioner also claims that an analogy to the Wreck Act cases is misguided, because those cases relied on an affirmative duty on the part of the owner of the vessel, or, where the vessel has been abandoned, the United States, to rid navigable waterways of obstructing vessels. We do not agree. None of the cases mentioned distinguished the exceptions found in the Rivers and Harbors Act as being based upon the imposition of an "affirmative duty." Indeed, there is no mandatory "affirmative duty" imposed on the United States to repair damages to river improvements, pursuant to 33 U.S.C. § 408, or to remove a sunken vessel, pursuant to 33 U.S.C. § 409. *See Wyandotte,* 389 U.S. at 204–05, 207, 88 S.Ct. at 387–88, 388–89. Rather, the exception is based upon the strong policy concern that if the Government chooses to repair damages or to remove a wreck, it should be reimbursed for the expenses involved. In any event, both negligent acts of commission or omission render parties liable for wreck removal expenses under 33 U.S.C. § 409. *United States v. Redwood City,* 640 F.2d 963, 967 (9th Cir.1981).

Both the Limitation of Liability Act and the Submarine Cable Act reflected important public policy concerns regarding international commerce in the Nineteenth Century. Congress, when it enacted the Submarine Cable Act, is deemed to have been aware of prior legislation impacting on the same subject matter. *See* Sutherland Stat. Const. § 51.02. However, by imposing a domestic limitation law onto a later statute specifically designed to implement an international treaty would have undermined our commitment to the Cable Convention. "Where fairly possible a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States." Restatement (Third) § 114. We believe it unlikely that Congress, having mandated that intentionally or negligently damaging a submarine cable is a crime, would permit the violator to limit its civil liability to the detriment of the injured party. *See Wyandotte,* 389 U.S. at 207, 88 S.Ct. at 388–89. As the *Wyandotte* court noted, our laws should not permit a "wrongdoer [to] shift[ ] responsibility for the consequences of his negligence onto his victim," nor should "the negligent party ... benefit from commission of a criminal act." 389 U.S. at 204, 88 S.Ct. at 387. Applying the Limitation of Liability Act to a case implicating the Submarine Cable Act would lead to precisely this result. We think that we correctly discern Congressional intent to effectuate the purposes of the Cable Act by finding that a party, who allegedly damaged an international submarine cable on the high seas, may not limit his civil liability.

We have held that the Limitation Act is inapplicable to claimants' cause of action based on accepted rules of statutory construction, legislative intent and an analogy to the Rivers and Harbors Act cases, particularly *Wyandotte.* We also believe our holding comports with modern maritime jurisprudence which has found the Limitation Act to be "hopelessly anachronistic." *Lewis Charters, Inc. v. Huckins Yacht Corp.,* 871 F.2d 1046, 1053 (11th Cir.1989). *See also Pettus v. Jones & Laughlin Steel Corp.,* 322 F.Supp. 1078 (W.D.Pa.1971). Over 35 years ago, Justice Black, writing for four members of the Supreme Court in a 4–4–1 decision in *Maryland Casualty Co. v. Cushing,* 347 U.S. 409, 437, 74 S.Ct. 608, 623, 98 L.Ed. 806 (1954), stated:

"Judicial expansion of the Limited Liability Act at this date seems especially inappropriate. Many of the conditions in the shipping industry which induced the 1851 Congress to pass the Act no longer prevail. And later Congresses, when they wished to aid shipping, provided subsidies paid out of the public treasury rather than subsidies paid by the injured persons."

*See also University of Texas*, 557 F.2d at 454.

The Act "has been attacked by many and defended by almost none," and the prognosis is that future cases will "whittle[ ] down," if not "flatly overrule[ ]," earlier cases and will narrowly construe the Act. Gilmore & Black, at 822. Thus, "in the vast majority of cases" courts have denied liability limitation based on various grounds. *Hines*, 551 F.2d at 728; *Olympic Towing Corp. v. Nebel Towing Co.*, 419 F.2d 230, 235 (5th Cir.1969), *cert. den.*, 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970).

There are several reasons why the Limitation of Liability Act has become economically obsolescent. The widespread use of the corporate form of ownership, the existence of liability and indemnity insurance, the relative decline in the importance of the merchant marine in the nation's commerce, and, finally, improved technology that gives the ship's owner greater control over the ship and crew outside of port have all rendered ship ownership much less risky now than it was in the middle of the Nineteenth Century. *See University of Texas*, 557 F.2d at 454; *Dillahey*, 733 F.Supp. at 880 (although severely criticizing the Act, finds that pleasure boats come within its scope); *CF Industries*, 1982 A.M.C. at 2445; Gilmore & Black, at 822.

Because we have rejected petitioner's claim of right to exoneration or limitation of liability in this proceeding, the plaintiffs/claimants are permitted complete relief through both in personam and in rem remedies.[21] *See The Chickie*, 141 F.2d 80, 84 (3d Cir.1944) (citing *Hartford Accident & Indemnity Company v. Southern Pacific Company*, 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612 (1927)); Supp. Fed.R.Civ.P. C(1).

Accordingly, plaintiffs'/claimants' Fed.R. Civ.P. 12(c) motion will be granted and it will be ordered that plaintiffs'/claimants' action for civil damages to the submarine

cable TAT–7 may proceed and is not subject to the injunction contained in the Court's October 30, 1989 Order Directing Issuance of Notice and Restraining Suits.

---

**21.** Because we find that petitioner has no right to limit its liability, the limitation proceeding is dissolved and we have no reason to consider plaintiffs'/claimants' alternative contentions that petitioner has not complied with the Limitation Act, that petitioner must increase the amount of security to include the value of the pending freight, or that petitioner post a bond in place of letters of guarantee, pursuant to Supp. Fed.R.Civ.P. F(7).